**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CASE NO. _____**

D.A.M. et al:

                Petitioners,

v.

WILLIAM BARR, Attorney General of the United States of America; and CHAD WOLF, Acting Secretary, Department of Homeland Security,

                Respondents.

**DECLARATION OF SHALYN FLUHARTY**

## DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are based on my personal knowledge and I can testify competently to them if called upon to do so. I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

2. I direct Proyecto Dilley, formerly known as the Dilley Pro Bono Project, in Dilley, Texas, and have done so since December 2016. In this capacity, I supervise a small team of attorneys and full-time paralegals, and a rotating group of volunteers. I have been practicing law since 2010. My practice has focused on representing detained unaccompanied immigrant children and detained immigrant families before the Executive Office of Immigration Review and the Department of Homeland Security.

3. Proyecto Dilley provides pro bono legal services on behalf of detained mothers and their children at the South Texas Family Residential Center in Dilley, Texas ("Dilley" or "STFRC").  The overwhelming majority of families who are detained in Dilley fled persecution and torture in their countries of origin and seek asylum and related protection in the United States. During my time with Proyecto Dilley, the project has represented over 40,000 families. Based on this experience, I am familiar with the conditions of detention at STFRC, the experiences of medical treatment—or lack of treatment—reported by my clients and revealed in medical records, and the removal process, generally.  Although deported families were at risk of harm in the removal process prior to the COVID-19 pandemic, the risk of harm is now greatly exacerbated.

4. Section 7.4 of the Immigration and Customs Enforcement ("ICE") Family Residential Standards require that ICE ensure the safe release of individuals who are processed for removal from the United States, transferred to another facility, or released into the community. Among other things, the standard directs ICE to confirm that a family's case information is accurate and up-to-date prior to release; to provide families and their representative-of-record with notice of release before it occurs; to ensure transportation providers have accurate and complete records on each family; to ensure safe transfer, particularly for individuals with special health care concerns; and to ensure transferred families have access to funds, valuables, and other property upon transfer. ICE Family Residential Standards, § 7.4(II) (relevant section is attached hereto as Exhibit "A").

5. The *Flores* Settlement Agreement also requires ICE to protect the safety of children class members, and to provide notice to counsel prior to a child's transfer. *See* Stipulated Settlement Agreement ¶¶ 12, 27, *Flores v. Reno*, No. CV-85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997). In my experience, ICE regularly fails to comply with all of these requirements.

6. Proyecto Dilley represents the Petitioners in this action in their immigration proceedings. Petitioners are mothers and minor children. Numerous Petitioners have documented and severe medical conditions. Some of the medical conditions of the minor children include asthma, heart murmurs, anemia, high blood pressure, tachycardia, fainting, uncontrolled gastritis, and respiratory illness that has required hospitalization. Some of the medical conditions of the mothers include asthma, anemia, high blood pressure, tachycardia, thyroiditis, liver disease, diabetes, undiagnosed chest pain, undiagnosed kidney problems,

seizure disorder, numbness in the extremities, and a tumor at the base of the skull. There are also Petitioners in recovery who recently survived surgery, a heart attack, and a stroke.

7. ICE consistently proceeds with the removal of an individual despite documented concerns that removal in and of itself will place the individual at risk of harm, if not death.

8. ICE and the ICE Health Services Corps work together to medically "clear" individuals for travel, in advance of their removal from the United States. I have personal knowledge of many families who were purportedly cleared for travel, when according to outside independent medical providers, they should not have been. On April 17, 2020, two mothers represented by Proyecto Dilley were transported for emergency medical care during the removal process while on a layover before their final removal flight. One of the mothers became unconscious during the initial flight, and the other lost lucidity due to symptoms of COVID-19 and severe fever. ICE was aware of the severity of each mother's medical condition prior to their departure from STFRC for removal, and even took one of the mothers directly from the medical unit at STFRC to the San Antonio airport. Both mothers were tested for COVID-19 by independent outside medical providers while receiving emergency medical treatment when the airlines refused their further travel. To my knowledge, the coronavirus test results were never shared with either family, and ICE successfully proceeded with the removal of one of the two families days after the mother was hospitalized.

9. Proyecto Dilley represented another mother who survived three heart attacks prior to her journey to the United States. Each heart attack lead to extended hospitalization, and on one occasion, the mother was pronounced dead before being revived. Prior to her detention at STFRC, medical professionals advised the mother that air travel would place her at immediate risk of death and was prohibited. While detained at STFRC, the mother experienced ongoing

signs of a fourth impending heart attack, including: stabbing chest pains, left-sided neck pain, a feeling of a heavy or swollen heart, rapid heart rate, loss of vision, dizziness, headaches, and loss of feeling in her hands, feet and lips.  The mother also lost consciousness numerous times while detained at STFRC and was transported to the hospital.  Despite ongoing advocacy from Proyecto Dilley, ICE removed the mother in January 2020.

10. Proyecto Dilley regularly requests medical records on behalf of detained families, and regularly sees requests for records ignored or delayed.  Even requests made by detained individuals for their own medical records are routinely denied. Proyecto Dilley's medical record requests are always time sensitive, and the government's failure to provide them prejudices Proyecto Dilley's ability to advocate on behalf of a client. Medical records provide critical evidence to support asylum claims, allegations of medical neglect, and requests for release from detention. The failure to promptly provide medical records also conflicts with the Family Residential Standards and Texas state law. *See* 52 Tex. Admin. Code § 165.2. Without prompt access to medical records, Proyecto Dilley is unable to effectively consult with independent medical experts regarding whether an individual is safe to fly.

11. For single mothers traveling with children, the few protections ICE is required to provide are necessary to protect a family's safety in the removal process. Unfortunately, ICE regularly fails to provide the protections promised by its own standards. I am aware of numerous cases in which ICE removed—or attempted to remove—a family absent up-to-date case information, without the family's medication and/or without the family's personal property.

12. As recently as April 29, 2020, a mother represented by Proyecto Dilley was transported to an airplane for removal.  When the mother arrived at the plane for removal, she was visibly unwell. Upon inquiry, the airline provider learned that the mother had been deprived

of her blood pressure medication for the entire day, and the facility failed to provide the mother with any medication upon release. As a result, ICE was unable to proceed with removal as planned.

13. ICE does not provide families or their attorneys of record with notice that a family will be removed prior to their deportation. Instead, ICE regularly informs families at around 8:00 p.m. that they will be processed for release from the facility immediately and placed on a removal flight the following morning at around 6:00 a.m. Families are required to immediately pack up their belongings and move to a staging area within STFRC, where they wait for hours overnight before being transported to the airport.

14. One exception to ICE's failure to provide families and their attorneys of record with advance notice of removal exists for Salvadoran citizens; ICE regularly provides Proyecto Dilley with notice that a family will be removed to El Salvador 24 hours before removal occurs as required by the *Orantes* Injunction. *See Orantes-Hernandez v. Gonzalez*, 504 F. Supp. 2d 825 (C.D. Cal. 2007). On May 18, 2020 at 9:55 a.m. ICE provided Proyecto Dilley with written notification that 28 individuals will be removed from STFRC to El Salvador tomorrow, May 19, 2020 at 10:00 a.m. All 28 of these individuals are Petitioners who seek emergency relief in this case.

15. ICE's failure to provide families and their attorneys of record with notice in advance of their removal eliminates a family's ability to safely plan for their return to their home country. Deportation flights typically land in large cities that are many hours away from where a family previously resided. Many Proyecto Dilley clients report they live in rural areas, up mountains where cars cannot travel. When families are informed they are being removed for the first time late in the evening when the removal process has already formally begun, they do not

have the opportunity to communicate with their family members and loved ones to advise them of their return and to coordinate the details of their travel upon arrival. Families are also generally unable to communicate with their attorney after they are advised of their deportation.

16. Many families arrive to STFRC without any money.  Other families arrive with some money, or have family members or friends who deposit money into their commissary account while they are detained.  When an individual is processed for release, if they have money in their commissary account, it should be returned to them when the leave the facility.  I have represented numerous families who—upon release from the facility—were not provided with the money in their commissary account or other personal possessions that were confiscated when they were taken into government custody. In particular, many clients report having their cell phone confiscated and not returned. Failure to provide families with their personal possessions, medication, and money places them in a dangerous and precarious situation upon arrival in their country of origin. Without access to money, families are unable to purchase food or tickets for travel back to their homes.

17. Furthermore, although some non-profit organizations and government agencies previously received deported STFRC families at the airport, and provided them with assistance making phone calls or purchasing bus tickets, many if not all of these resources—to my knowledge—have been eliminated during the COVID-19 pandemic.

18. The COVID-19 pandemic has created new dangers for detained individuals, which are multiplied in the removal process.  ICE's ongoing detention of individuals in congregate care facilities that do not allow for social distancing has spurred significant litigation. *See, e.g.*, *Alcantara v. Archambeault*, No. 3:20-cv-00756-DMS-AHG (S.D. Cal. Apr. 30, 2020); *Fraihat v. ICE*, No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020); *O.M.G. v. Barr*, 1:20-

cv-00786-JEB, March 30, 2020 Minute Order (D.D.C. Mar. 30, 2020); *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 740 (C.D. Cal. Mar. 28, 2020). The pressure of this litigation has moved ICE to expedite removal of individuals in high volumes, even though detainees are not fit to fly, have been denied critical medical care while detained, and may be COVID-19 positive.

19.  Reports from Guatemala show that over one hundred individuals deported to Guatemala since late March 2020 tested positive for COVID-19. *See, e.g.*, Sofia Menchu, *Maya Villages in Guatemala Spurn U.S. Deportees ad Infections* Spike, Reuters (May 1, 2020), https://www.reuters.com/article/us-health-coronavirus-guatemala-deportee/maya-villages-in-guatemala-spurn-u-s-deportees-as-infections-spike-idUSKBN22D5H3.  One Guatemalan government official estimated that approximately 75 percent of individuals removed to Guatemala in one flight in March 2020 tested positive. Maria Martin, *Official Alleges the U.S. has Deported Many COVID-Positive Migrants to Guatemala*, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-to-guatema.

20.  ICE was ordered to release children detained at STFRC on March 28, 2020, April 10, 2020, and April 24, 2020. *See Flores*, No. CV-85-4544-DMG (AGRx), Dkt. No. 740 (C.D. Cal. Mar. 28, 2020); *Flores*, CV-85-4544-DMG (AGRx), Dkt. No. 768 (C.D. Cal. Apr. 10, 2020); *Flores*, No. CV-85-4544-DMG (AGRx), Dkt. No. 784 (C.D. Cal. Apr. 24, 2020). ICE was ordered to release mothers from STFRC on March 30, 2020. *O.M.G.*, 1:20-cv-00786-JEB, March 30, 2020 Minute Order. ICE has failed to comply with these orders as required. Instead, ICE has attempted to hastily remove families (a process which takes significantly more time to facilitate than release in the United States). This haste has led to new unprecedented changes to

7

the removal process for STFRC families. Previously, families detained at STFRC were most commonly removed on commercial flights. Now, I have reason to believe families are being placed on ICE Air flights, where they are forced to travel with other adult ICE deportees who are in handcuffs.

21. I learned about this for the first time when I received a call from a Guatemalan reporter on April 30, 2020, who advised me that 20 family units were removed to Guatemala on an ICE flight with 69 adult men detainees. The reporter advised me that the flight arrived at 4:00 p.m. in the afternoon, and departed from Brownsville, Texas. Brownsville, Texas is a small town along the U.S.-Mexico border. It is a four-and-a-half-hour drive away from Dilley, Texas. I am unaware of any removal flights that initiated in Brownsville, Texas and carried Dilley families prior to the COVID-19 pandemic.

22. Given the great proportion of ICE detainees who have contracted COVID-19 throughout the country, and the impossibility of facilitating social distancing on an airplane, families represented by Proyecto Dilley have expressed increasing concerns regarding the likelihood that they will be exposed to COVID-19 during the removal process. ICE's efforts to remove high volumes of individuals from ICE detention facilities who are intermixed with family units from STFRC places families at heightened and unjustified risk of harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 18, 2020 in Ft. Myers, Florida.

                                          Shalyn Fluharty