**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **D.A.M,** *et al.,* | |
| Petitioners, | |
| v. | Case No. 20-cv-1321 (CRC) |
| **WILLIAM BARR,** in his official capacity as Attorney General of the United States, *et al.*, | |
| Respondents. | |

## <u>MEMORANDUM OPINION</u>

Petitioners in this case are nearly 100 families from eleven countries who were denied asylum after entering the United States without valid entry documents and, consequently, are subject to orders of expedited removal from the country.  Many of them are currently being detained by Immigration and Customs Enforcement ("ICE") at either the South Texas Family Residential Facility in Dilley, Texas ("Dilley") or the Berks County Residential Center in Leesport, Pennsylvania ("Berks").  Others have been released for medical or other reasons.  All petitioners seek a writ of habeas corpus preventing ICE from deporting them during the COVID-19 pandemic.  Presently before the Court is a motion for a temporary restraining order, filed on behalf of the detained petitioners only, seeking an emergency stay of their imminent removals. They contend that if the removals were to go forward as planned, they would be exposed to increased risk of contracting COVID-19 during the deportation process, and later in their home countries, which would violate their due process rights and ICE's internal regulations.  Finding that it likely has jurisdiction to review petitioners' challenge to the conditions they would experience during the deportation process but concluding that they have not satisfied the

requirements for preliminary injunctive relief, the Court will deny their TRO motion and lift the administrative stay of removal that the Court put in place while it considered the motion.

## I.      Background

A.  Deportation in the Time of COVID-19

It goes without saying that we are in the midst of a global pandemic.  As of this writing, there are over fourteen and a half million confirmed cases of COVID-19 worldwide with over 600,000 people dead.  See WHO, Coronavirus Disease (COVID-19) Pandemic (updated July 21, 2020).[1]  The United States remains a hotspot, with over three and a half million confirmed cases and more than 140,000 deaths.  CDC, Cases in the U.S. (updated July 21, 2020).[2]

COVID-19 is highly contagious.  It spreads primarily through close person-to-person contact, because carriers of the virus produce airborne respiratory droplets when they cough, sneeze, or talk that may be inhaled by others standing nearby.  See CDC, How to Protect Yourself & Others (Apr. 14, 2020).[3]  Though less frequent, the virus can be also spread through contact with contaminated surfaces.  See CDC, Detailed Disinfection Guidance (updated July , 2020).[4]  Symptoms, such as fever, cough, and shortness of breath, typically appear two to fourteen days after exposure, but even those who are asymptomatic may be capable of spreading the disease.  CDC, Clinical Questions about COVID-19: Questions and Answers – Transmission

---

[1] https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

[2] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[3] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[4] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

(July 21, 2020).[5]  The most effective ways to prevent contracting the virus are to avoid being

within six feet of other people, to wash your hands frequently, to avoid crowded places and

gathering in groups, to cover your mouth and nose with a mask when around others, and to clean

and disinfect frequently touched surfaces.  See CDC, How to Protect Yourself & Others (Apr.

24, 2020).  In addition, the CDC discourages travel because it "increases your chances of getting

infected and spreading COVID-19" by making it difficult to follow the practices laid out in the

prevention guidelines.  CDC, Travel in the US (June 28, 2020).[6]  But, neither the CDC, nor any

other U.S. governmental body to the Court's knowledge, has banned travel altogether.  Id.

(providing tips on how to "protect yourself and others" if you travel).  Indeed, commercial air

travel has continued throughout the duration of the pandemic, although at reduced levels and

with heightened safety precautions.  See Dep't of Transp., et al., Runway to Recovery (July

2020).[7]  To date, there is no approved vaccine or cure for COVID-19.  CDC, How to Protect

Yourself & Others (Apr. 24, 2020).

　　During the pandemic, ICE has continued to deport noncitizens subject to final removal

orders.  At the heart of this case is whether appropriate safeguards are being taken during the

deportation process.  ICE has submitted declarations from officials familiar with the process,

and, while not to be accepted blindly, these declarations are subject to a presumption of good

faith absent clearly contradictory evidence.  C.G.B. v. Wolf, No. 20-cv-1072, 2020 WL 2935111,

at *6 (D.D.C. June 2, 2020) (Cooper, J.) (citing cases).  According to ICE's declarants, it has

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission.

[6] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html.

[7] https://www.transportation.gov/sites/dot.gov/files/2020-07/Runway_to_Recovery_
07022020.pdf.

implemented additional health screening, cleaning, and transportation protocols to help prevent the spread of COVID-19 while executing final orders of removal.  Harper Decl. ¶ 7.  ICE attests that a medical professional with its Health Service Corps completes a transfer summary certifying that each detainee is medically cleared for travel after a review of their medical records.  Id. ¶ 10.  ICE conducts COVID-19 testing prior to removal, but only for migrants being returned to countries that require the United States to do so.  Id. ¶ 11.  ICE has also implemented additional pre-removal screening procedures, which entail evaluations of all deportees by a health professional to determine whether they are experiencing any symptoms that would preclude their travel, including those associated with COVID-19.  Id. ¶ 12.  Prior to boarding any transportation vehicle, ICE also questions each detainee to confirm whether she is experiencing any COVID-19 symptoms.  Id. ¶ 14.  If the detainee clears this screening process, she is scheduled for removal.  Id.  Prior to removal, ICE medical staff ensures that each deportee's temperature is below 99 degrees, well under the 100.4-degree threshold that the CDC has identified as a symptom of COVID-19.  Id. ¶ 15.

ICE further attests that it provides detainees with personal protective equipment ("PPE"), including surgical-grade face masks, nitrile gloves on request, and hand sanitizer, throughout the removal process.  Id. ¶ 17.[8]  The same is true for transportation personnel.  Id. ¶ 22.  ICE requires masks to be worn at all times and performs temperature checks on detainees every hour.  Id. ¶ 26.  It now uses ICE-operated aircraft and ground vehicles only, which it says comply with CDC

---

[8] Petitioners present declarations from migrants deported earlier in the pandemic who say they were not provided with the full range of PPE.  See, e.g., T.A.L. Decl. ¶ 5 (no gloves); M.D.R.F. Decl. ¶ 5 (no gloves); M.M.R. Decl. ¶ 4, 8 (no gloves); M.C.P. Decl. ¶ 8 (no mask); A.C.L.T. Decl. ¶¶ 2–4 (no mask).  ICE disputes some of these reports, but nonetheless responds that PPE is fully available to all deportees now.  Hunt Decl. ¶¶ 9–16.

and ICE detention standards.  Id. ¶ 7.  ICE explains that all vehicles used during the removal process are thoroughly cleaned and disinfected by a contractor before and after transports.  Id. ¶ 21.

Upon arrival at an intermediate destination within the U.S., transportation specialists once again check all deportees' temperatures.  Id. ¶ 28.  ICE permits deportees to keep any PPE on the next mode of transportation or for use in their home countries.  Id.  ICE flights now have an extra medical provider, and its medical staff conducts another round of temperature checks and visual screenings at the airport.  Cordero Decl. ¶ 11–12.  Detainees who fail these screenings are denied boarding.  Id. ¶ 13.  During the flights, families must sit in the front of the plane while individuals are placed at the rear, and, if possible, ICE instructs that empty seats remain between families and individuals to maintain physical distance.  Id. ¶ 18.  The ICE-chartered planes are also cleaned and disinfected after every flight.  Id. ¶ 19.  As noted, ICE only tests deportees for COVID-19 prior to removal to countries that "require testing prior to repatriation."  Id. ¶ 7.  It explains that it simply "does not have enough testing resources to test all" noncitizens "scheduled for future removals."  Id. ¶ 8.

Petitioners insist that many of the precautions ICE describes are simply not being taken and that others are woefully inadequate.  For example, an attorney who works with clients detained at the Berks family residential center in Pennsylvania declares that deportation from that center requires the use of public transportation and entails comingling with detainees from other detention centers.  Cambria Decl. ¶ 10–14.  ICE acknowledges that detainees are comingled during the deportation process but adds that social distancing is practiced "to the extent possible."  Cordero Decl. ¶ 18.  Petitioners explain that, prior to the pandemic, deportees often had layovers with commercial airlines.  Cambria Decl. ¶ 12.  As noted, however, ICE

represents that it is currently only using ICE-chartered flights and "has taken reasonable steps to ensure that all Air Charter flights comply" with CDC and FAA regulations.  Martinez Decl. ¶ 4. Despite ICE's precautions, petitioners report that some removal flights have included individuals infected with COVID-19.  Cambria Decl. ¶ 15.

In addition to the dangers they face during the deportation process, petitioners fear what may await them when they reach their home countries.[9]  Many of these countries' medical systems, they allege, are ill-equipped to handle an influx of cases.  Am. Pet'n & Compl. ¶¶ 209– 32.  In some countries, such as Guatemala, petitioners say that new arrivals from the United States are persecuted because they are seen as bringing the virus with them.  See, e.g., T.A.L. Decl. ¶¶ 12–26 (prior deportee describing physical intimidation and verbal abuse upon arrival in Guatemala).  They claim further that many of the non-profits and government agencies that typically provide services to arriving deportees have been shuttered due to COVID-19.  Fluharty Decl. ¶ 17.  Thus, some petitioners fear that they will be unable to contact family members or arrange transportation to their final destinations upon their arrival.

B.  Procedural History

1.  *Expedited Removal and Applications for Asylum*

Petitioners each sought admission to the United States without valid entry documents and, as a result, were placed into expedited removal proceedings.  Under the expedited removal statute, immigration officers were required to remove petitioners "from the United States without further hearing or review unless [they] indicate[d] either an intention to apply for asylum . . . or a

---

[9] Petitioners hail from Guatemala (72), Honduras (57), El Salvador (39), Haiti (14), Mexico (13), Ecuador (13), Brazil (6), Colombia (3), Chile (3), Nicaragua (2), and Peru (2).  Am. Pet'n & Compl. ¶¶ 36–121.

fear of persecution" supporting a claim of withholding of removal.  8 U.S.C. § (b)(1)(A)(i).

After petitioners so indicated, they were interviewed by asylum officers, who sought to ascertain

whether each petitioner possessed a credible "fear of persecution," such that there was "a

significant possibility . . . that [they] could establish eligibility for asylum."  Id.

§ 1225(b)(1)(B)(v).  The asylum officers determined that all the petitioners failed to show a

credible fear of persecution.  Consequently, they were required by statute to be "removed from

the United States," subject to review within seven days by an immigration judge upon

petitioners' request.  Id. § 1225(b)(1)(B)(iii)(I)–(III).  Petitioners requested this "prompt review,"

id., but the immigration judges all concurred with the asylum officers' negative credible fear

determinations.  Petitioners therefore each have a final order of expedited removal pursuant to

§ 1225(b).  As described in more detail below, the Immigration and Nationality Act ("INA")

severely limits judicial review of any of these determinations so as to ensure that removal is

indeed expedited.  Id. § 1252(a)(2)(A).

     Many of the petitioners faced an additional hurdle to establishing a claim for admission in

the summary expedited removal process.  Last year, the Department of Homeland Security and

the Department of Justice jointly issued an interim rule, known as the "Transit Ban," that

rendered migrants seeking admission at the border with Mexico categorically ineligible for

asylum unless they first applied for and were denied similar protection in a third country through

which they traveled.  Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829,

33,835 (July 16, 2019).  The Transit Ban, however, did not prevent petitioners from seeking

admission and a withholding of removal under either section 241(b)(3) of the INA (which

enables them to seek a withholding of removal after they have a final order) or the Convention

Against Torture (which provides separate protections from removal).  The upshot of the rule was

that petitioners who did not apply for asylum in an interim country faced a more substantial

burden when they sought admission to the U.S.; under both section 241(b)(3) and the Convention

Against Torture, asylum seekers are required to show that "it is more likely than not" that they

would either be persecuted on a protected ground or would be tortured if removed to the

proposed country.  See 8 C.F.R. § 1208.16(b)(2); id. § 1208.16(c)(2).  If petitioners subject to the

Transit Ban could not show that there was a "significant possibility" that they were eligible for

relief under either of those standards, the asylum officer was required to make a negative

credible-fear determination.  Id. § 208.30(e)(2)–(3), (g).  While this motion was pending, Judge

Timothy J. Kelly found that the Transit Ban violated the APA and vacated the rule.  Cap. Area

Immigrants' Rts. Coal. v. Trump, No. 19-cv-2117, 2020 WL 3542481, at *21–23 (D.D.C. June

30, 2020).[10]

### 2.  Related Litigation

Petitioners are no strangers to this court.  Last September, some of them challenged the

validity of their removal orders in an action before Judge Amy Berman Jackson.  See M.M.V. v.

Barr, No. 19-cv-2773, 2020 WL 1984309 (D.D.C. Apr. 27, 2020).[11]  They invoked the court's

---

[10] After Judge Kelly vacated the Transit Ban, petitioners here amended their habeas petition and complaint to add a claim arguing that petitioners who were subject to the vacated Transit Ban do not have lawful final orders of removal. Am. Pet'n & Compl. ¶¶ 299–310. However, the currently detained petitioners have not moved to stay their removal on this ground. The Court therefore has not considered Judge Kelly's ruling in deciding the present TRO motion.

[11] Many of the petitioners are also plaintiffs in another lawsuit in this court seeking immediate release of all detainees in three family residential centers, including Dilley and Berks, on the ground that ICE's failure to protect them from COVID-19 at the facilities violates due process. See Petition & Complaint at 38–42, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (D.D.C. Mar. 21, 2020); Motion for Preliminary Injunction at 25, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (D.D.C. July 2, 2020) (seeking a court order requiring DHS "to promptly release Petitioners *and all detained families* at the FRCs") (emphasis added).

jurisdiction under 8 U.S.C. § 1252(e)(3), which authorizes federal court challenges to "written" policies "implementing" expedited removal orders under certain circumstances.  Judge Jackson dismissed the bulk of the claims, finding that the majority of the alleged policies that the petitioners challenged were not written and that the INA clearly stripped the court of jurisdiction to review unwritten policies.  M.M.V., 2020 WL 1984309, at *10–19.  She also denied several motions to join the suit by many would-be plaintiffs (also petitioners here) because they either were not subject to the one written (and thus reviewable) policy or failed to challenge it within sixty days of its implementation, as required by the statute.  Id. at *20–22.  Upon making that determination, Judge Jackson lifted an administrative stay of petitioners' deportations.  Id. at *21.  The government began removing individuals the next day, and petitioners sought to stay their deportations pending appeal.  M.M.V. v. Barr, No. 19-cv-2773, 2020 WL 2119744, at *1 (D.D.C. May 1, 2020) (order denying stay pending appeal).  Judge Jackson had entered another administrative stay while she considered the motion to stay pending appeal, but she ultimately denied the motion because the INA barred her from entering any injunctive relief.  Id. at *3–4. The D.C. Circuit issued a third administrative stay in the case within an hour of Judge Jackson's denial of the stay motion but lifted it two weeks later when it denied petitioners' emergency motion for a stay pending appeal.  Order, M.M.V. v. Barr, No. 20-5106 (D.C. Cir. May 1, 2020) (per curiam) (administrative stay); Order, M.M.V. v. Barr, No. 20-5106 (D.C. Cir. May 15, 2020) (per curiam) (denying stay pending appeal).  While petitioners in M.M.V. apparently did not raise the argument that lifting of the stay would expose them to undue COVID-19 risks, both Judge Jackson and the Circuit surely appreciated the fact that deportations were likely to resume forthwith during the pandemic.

### 3.   Proceedings in this Case

This petition for habeas corpus, complaint for injunctive relief, and motion for temporary restraining order ("TRO") followed the next business day after the Circuit lifted petitioners' stay of removal.  That evening, Judge Carl J. Nichols, acting in his capacity as emergency motion judge, administratively stayed the deportations of the detained petitioners until a judge could be assigned the case.  Order Granting Administrative Stay (May 18, 2020), ECF No. 8.  Petitioners had indicated that this case was related to M.M.V. because it involved the same petitioners seeking similar relief.  Notice of Related Case (May 18, 2020), ECF No. 12.  But this case raises different claims than those in M.M.V.  There, petitioners challenged the legality of the process and standards that ICE used to determine that they were not entitled to asylum in the first instance.  Here, petitioners seek to prevent the government from deporting them during a global pandemic in violation of the Constitution and the APA.  Based on these differences, Judge Jackson determined the cases were not related and ordered this petition to be randomly reassigned.  Minute Order (May 19, 2020); Order (May 21, 2020), ECF No. 15.  She also extended Judge Nichols' stay until the assignment was made.  Id.  Upon receiving the case, this Court further extended the administrative stay while it considered the TRO motion and heard oral argument two days later.  The government filed an opposition prior to the hearing, and the Court permitted petitioners to file a reply afterwards.  The government has also sought leave to file a surreply, which the Court has considered and grants leave file.[12]  The TRO motion is now ripe.

_____

[12] Petitioners ask the Court to take judicial notice of two extra-record pieces of evidence. *First*, petitioners seek to introduce congressional testimony by ICE's Executive Associate Director of Enforcement and Removal Operations, who recently testified to Congress that not all

## II.     Legal Standards

"A TRO is an extraordinary remedy and should be granted sparingly."  Basel Action

Network v. Mar. Admin., 285 F. Supp. 2d 58, 60 (D.D.C. 2003).  To obtain a TRO, the moving

party must show: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to

suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

his favor; and (4) that an injunction is in the public interest.  See Winter v. Nat'l Res. Def.

Council, 555 U.S. 7, 20 (2008); Hall v. Johnson, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The

same standard applies to both temporary restraining orders and to preliminary injunctions").  The

D.C. Circuit has suggested, without holding, that the failure to establish a likelihood of success

on the merits categorically forecloses preliminary relief.  Sherley v. Sebelius, 644 F.3d 388, 393

(D.C. Cir. 2011).  It has made clear, however, that an absence of irreparable injury is fatal to a

plaintiff's motion.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C.

Cir. 2006).

Before reaching the merits, the Court should ensure that it has jurisdiction to consider

petitioners' claims.  Courts evaluate whether they have jurisdiction through the lens of the

---

deportees are tested prior to removal.  Pet'rs' Mot. for Judicial Notice (June 8, 2020), ECF No.
25.  The Court will take judicial notice of this sworn testimony because congressional testimony
"is not subject to reasonable dispute."  Fed. R. Evid. 201(b)(2); see also Didban v. Pompeo, 435
F. Supp. 3d 168, 177 n.5 (D.D.C. 2020) (this Court taking judicial notice of congressional
testimony).  Second, petitioners seek to introduce two newspaper articles discussing deportees
who have tested positive for COVID-19 after removal.  Pet'rs' Mot. for Judicial Notice (June 26,
2020), ECF No. 29.  The Court will take judicial notice of the "existence of these articles," to
show that ICE is aware of the reports.  Sandza v. Barclays Bank PLC, 151 F. Supp. 3d 94, 113
(D.D.C. 2015) (taking judicial notice of newspaper articles "not . . . for the truth of their
assertions," but "for the fact that they . . . should have put plaintiff on notice of [their contents]"
(citing Washington Post v. Robinson, 935 F.2d 282, 291 (D.C. Cir. 1991) ("[A] court may take
judicial notice of the existence of newspaper articles in the Washington, D.C., area that
publicized" certain facts.))).

standard applicable at each stage of litigation.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561

(1992).  For example, "a party who fails to show a 'substantial likelihood' of standing is not

entitled to a" temporary restraining order.  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905,

913 (D.C. Cir. 2015) (citation omitted).  "That same reasoning . . . extends to other jurisdictional

prerequisites."  California Ass'n of Private Postsecondary Sch. v. DeVos, 344 F. Supp. 3d 158,

167 (D.D.C. 2018).  Thus, "[a]s part of establishing a likelihood of success on the merits, the

[petitioners] must first demonstrate a likelihood of success in establishing jurisdiction."  Make

the Rd. New York v. Wolf, 962 F.3d 612, 623 (D.C. Cir. 2020).

### III.  Analysis

The petitioners who are currently detained at the Dilley and Berks facilities seek an

emergency stay of their removal orders during the pandemic.  They in essence raise two sorts of

claims.  First, they allege that the travel conditions they would experience *during* the deportation

process do not comport with ICE or CDC guidelines and are inherently unsafe.  Thus, they

contend that requiring them to travel during the pandemic violates their substantive due process

rights and the Administrative Procedure Act ("APA").  Second, they allege that the conditions

they would encounter in their home countries *after* the deportation process are dangerous due to

both the prevalence of COVID-19 and the stigma of having traveled from the United States.

Consequently, they claim releasing them in those destinations during the pandemic would also

violate their due process rights.

### A.  Likelihood of Jurisdiction

As mentioned, petitioners "must first demonstrate a likelihood of success in establishing

jurisdiction."  Make the Rd., 962 F.3d at 623.  ICE contends that the Court lacks the power to

review petitioners' claims due to section 242 of the INA, 8 U.S.C. § 1252, which strips federal

courts of jurisdiction to hear a wide variety of claims made by noncitizens in connection with their immigration proceedings.  The Court interprets jurisdiction-stripping provisions like § 1252 "against the backdrop of 'a familiar principle of statutory construction: the presumption favoring judicial review of administrative action.'"  Id. (quoting Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1069 (2020)) (applying the presumption in interpreting § 1252).  This "'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review" and "can be overcome only by clear and convincing evidence of congressional intent to preclude judicial review" over petitioners' claims.  Id. at 624 (internal quotations omitted).  That principle in mind, the Court will "start with the text, and then read those words in light of the statutory structure and context."  Id.  The government argues that review of both sets of petitioners' claims are independently foreclosed by two subsections of § 1252, namely § 1252(a)(2)(A) and § 1252(g).  The Court takes each in turn.

> *1. Section 1252(a)(2)(A)*

Section 1252(a)(2)(A) limits judicial review of orders of expedited removal issued under 8 U.S.C. § 1225(b)(1).  The relevant parts state:

> (2) Matters not subject to judicial review.
>
> > (A) Review  relating  to  section  1225(b)(1).    Notwithstanding  any  other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, *no court shall have jurisdiction to review—*
> >
> > > (i)    *except as provided in subsection (e)*, any individual determination *or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title*.

8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added).[13]  The government contends that the prohibition against judicial review of any claim "arising from or relating to the implementation . . . of an order of [expedited] removal" bars review of all of petitioners' claims here.  Id.  The Court does not read that text so broadly.  While the phrase "arising from or relating to" is expansive, it is not limitless.  See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 476–87 (1999) (narrowly construing the phrase "arising from" in § 1252(g)); Jennings v. Rodriguez, 138 S. Ct. 830, 839–41 (2018) (plurality) (narrowly construing the phrase "arising from" in § 1252(b)(9) and emphasizing the Court's long history of "eschew[ing] uncritical literalism" when interpreting phrases like "arising from and relating to" when it would "lead[] to results that no sensible person could have intended." (internal quotation marks omitted)).

The Supreme Court's ruling in Jennings v. Rodriguez highlights the point.  Jennings presented a claim by arriving noncitizens that their prolonged detention without a bond hearing

---

[13] The government makes passing reference in its briefs to romanettes (ii)-(iv) of § 1252(a)(2)(A).  To the extent the government contends that these provision bar petitioners' claims, the Court finds them inapplicable.  Petitioners do not challenge (ii) any "decision . . . to invoke" § 1225(b)(1); (iii) "the application of" § 1225(b)(1) to them; or (iv) any "procedures and policies adopted . . . to implement" § 1225(b)(1).

Subsection (e), the carve out to the jurisdictional bar in § 1252(a)(2)(A), is also inapplicable.  Subsection (e) permits judicial review over three specific factual questions in habeas proceedings and over certain systemic challenges to the expedited removal process.  With respect to an individual habeas petition, the Court may only review (1) whether a petitioner is a noncitizen, (2) whether they were in fact ordered removed, and (3) whether they have been lawfully admitted for permanent residence, as a refugee, or been granted asylum.  8 U.S.C. § 1252(e)(2).  As for systemic challenges, the suit must be "filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented."  Id. § 1252(e)(3).  It is undisputed that these claims fall outside those parameters.

Thus, the only inquiry remaining is under romanette (i), which asks whether petitioners' claims "aris[e] from or relat[e] to the implementation or operation of an order of removal pursuant to section 1225(b)(1)."

violated due process.  Jennings, 138 S. Ct. at 839.  Section 1252(b)(9), another of the INA's jurisdiction-stripping provisions, requires all claims "arising from any action taken or proceeding brought to remove an alien from the United States" to be brought together, at once, in a review of a final order of removal before a federal circuit court.  8 U.S.C. § 1252(b)(9).[14]  The claims in Jennings, however, were brought separately from any review of a final order and in the district court.  The government thus argued that § 1252(b)(9) foreclosed the plaintiffs' length-of-detention challenge, at least until the review of a final order of removal, because the detention itself arose from the removal proceedings.

A three-justice plurality of the Supreme Court rejected the government's argument.[15] Writing for the plurality, Justice Alito explained that § 1252(b)(9) did not bar the claims challenging prolonged detention because the plaintiffs did "not ask[] for review of an order of removal; they [were] not challenging the decision to detain them in the first place or to seek removal; and they [were] not even challenging any part of the process by which their removability [would] be determined."  Jennings, 138 S. Ct. at 841 (plurality).  The length-of-detention constitutional claims were ancillary to the removal orders, the plurality explained,

_____

[14] Section 1252(b)(9) does not apply to the expedited removal process petitioners underwent here.  See 8 U.S.C. § 1252(a)(1) (exempting expedited orders of removal from the judicial review provisions of subsection (b)).  As discussed, the § 1252(a)(2)(A) jurisdiction-stripping provisions govern the reviewability of claims by noncitizens with expedited removal orders.

[15] Although the bulk of the Jennings opinion garnered a majority vote, the jurisdiction section interpreting the INA was only joined by three members of the Court.  However, six justices in total (the plurality plus a three-justice dissent) agreed that the INA did not bar review. (The dissent would have read the INA jurisdiction-stripping provisions even more narrowly than the plurality.)  The two concurring justices, who joined the remainder of the Jennings opinion, would have held that the INA barred the petitioners claims.  (Attentive readers will have counted only eight votes; Justice Kagan did not participate in the case.)

because "the legal questions" in the case were "too remote from" any "action taken to remove an alien," even if detention itself arises from such an action. Id. at 841 n.3. This was so even though "it may be argued" that the length-of-detention claims arose from the actions taken to order removal "in the sense that if those actions had never been taken, the aliens would not be in custody at all." Id. at 840. A contrary conclusion, in Justice Alito's view, would have led to "staggering results," such as requiring Bivens claims based on inhumane conditions of confinement or state-law tort claims to be reviewable only during judicial review of final removal orders. Id.

Justice Thomas (along with Justice Gorsuch) rejected the plurality's reasoning because, to him, "detention *is* an 'action taken . . . to remove' an alien[.]" Id. at 855 (Thomas, J., concurring in part). As a result, he would have rejected the detainees' challenge as they were only contesting the fact of their detention. Id. He noted, however, that his interpretation of the statute would still preclude the "staggering results" that the plurality feared. Id. He explained:

> [M]y conclusion that § 1252(b)(9) covers an alien's challenge to the *fact* of his detention (an action taken in pursuit of the lawful objective of removal) says nothing about whether it also covers claims about inhumane treatment, assaults, or negligently inflicted injuries suffered *during* detention (actions that go beyond the Government's lawful pursuit of its removal objective).

Id. (citing Bell v. Wolfish, 441 U.S. 520, 536–39 (1979) (drawing a similar distinction)).

The three remaining justices would have read the language in § 1252(b)(9) even more narrowly, such that it would only apply to challenges to the removal order itself. Id. at 876 (Breyer, J., dissenting). Thus, the Court unanimously agreed that ancillary challenges, such as those to the conditions of confinement, were not channeled into the review of a final removal order by § 1252(b)(9).

Jennings' logic applies here.  Recall that § 1252(a)(2)(A)(i) bars the Court from reviewing "any individual determination or [from] entertain[ing] any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," which governs expedited removals.  Section 1252(b)(9), at issue in Jennings, is similar.  Although it does not bar review completely, it requires claims "arising from any action taken or proceeding brought to remove an alien from the United States," apart from expedited removal orders, to be brought alongside the review of a final removal order before a federal circuit court.  8 U.S.C. § 1252(b)(9).  Justice Thomas' distinction between challenging the *fact* of detention and challenging circumstances that arise *during* detention perfectly encapsulates the issues here, and all eight of the justices who participated in Jennings agreed that § 1252(b)(9) did not apply to ancillary claims such as those that arise from conditions suffered during detention.

Petitioners' first set of claims (i.e., those aimed at COVID-related travel risks) do not challenge the *fact* of their removals; they challenge the conditions they would face *during* the removal process.  Those claims are not related to the executive's discretionary decisions to implement or execute a removal order.  See Reno, 525 U.S. at 486 (recognizing that § 1252(a)(2)(A) is "aimed at protecting the Executive's discretion from the courts").  Furthermore, accepting the government's expansive interpretation of § 1252(a)(2)(A) would lead to even more absurd results than the Supreme Court contemplated in Jennings.  There, the plurality explained that interpreting § 1252(b)(9) to cover the plaintiffs' length-of-detention claims would have required claims based on inhumane conditions of confinement and state law tort claims to be reviewed only during the review of final orders.  Jennings, 138 S. Ct. at 840. That delay could have prevented meaningful review for noncitizens detained at length before they were able reach the courthouse doors.  Here, because petitioners are subject to expedited

removal orders, the government's interpretation would mean that alleged unconstitutional conditions of confinement could not be challenged *at all*. See 8 U.S.C. § 1252(a)(2)(A).

In sum, the INA gives the government virtually unreviewable authority to decide whether and when to implement the petitioners' removal orders, but the Court retains jurisdiction to hear claims challenging the constitutionality of the manner in which the government physically carries out the removals during the deportation process. That conclusion comports with the text and purpose of § 1252(a)(2)(A) and prevents the type of "staggering results" that the Supreme Court sought to avoid in Jennings.[16]

    *2. Section 1252(g)*

Turning to § 1252(g), which the government contends independently strips the Court of jurisdiction over all of petitioners' claims, the Court likewise finds that petitioners' conditions-of-deportation claims likely are not barred by that provision. Section 1252(g) prohibits the courts from hearing any claim "*arising from the decision or action by the Attorney General to* commence proceedings, adjudicate cases, or *execute removal orders*." 8 U.S.C. § 1252(g) (emphasis added). The Supreme Court has narrowly construed this subsection to preclude only

---

[16] The Third Circuit's decision in Castro v. DHS, 835 F.3d 422 (3d Cir. 2016), which the government cites to support its claim of non-reviewability, is not to the contrary. There, habeas petitioners claimed that "the asylum officer and [immigration judge] conducting their credible fear interview and review violated their Fifth Amendment procedural due process rights," as well as other rights under statutes and treaties, by "fail[ing] to prepare a written record of their negative credible fear determinations that included the officers' analysis of why . . . the alien has not established a credible fear of persecution," and by "apply[ing] a higher standard for evaluating the credibility of their fear of persecution than is called for in the statute." Castro, 835 F.3d at 428 & n.8. Those claims were clearly barred by the INA because they related directly to the agency's process of determining whether the noncitizens should be removed. Castro did not confront whether claims that are untethered to the process or decision to implement a removal order, like those here challenging the manner of deportation, fall within the ambit of the statute. As explained above, they do not.

challenges to the three enumerated actions listed in the statute: deciding to commence proceedings, deciding to adjudicate cases, and deciding to execute removal orders.  Reno, 525 U.S. at 482.  These three actions, the Court has observed, "represent the initiation or prosecution of various stages in the deportation process."  Id. at 483.  "At each stage the Executive has discretion to abandon the endeavor," and Congress saw fit to insulate these discretionary judgments from judicial review.  Id. at 483–84 (observing that Congress sought to curtail the ability of noncitizens to challenge discretionary decisions by the government not to defer immigration actions "for humanitarian reasons or simply for its own convenience," which had become a regular practice); see also DHS v. Regents of Univ. of Cal., 140 S. Ct. 1891, 1907 (2020) ("Section 1252(g) is . . . narrow.").

By contrast, *non*discretionary decisions, such as physically deporting noncitizens in an unconstitutional manner, likely fall outside the statute's jurisdictional bar.  And petitioners' challenge to the physical manner of their deportation does not implicate the agency's discretionary decision to execute their removal orders.  The immigration authorities are "empowered to remove Petitioner[s] at their discretion.  But they cannot do so in any manner they please."  You, Xiu Quing v. Nielsen, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018).  The decisions challenged here regarding how to transport deportees during the ongoing pandemic are more akin to the "other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"—that the Supreme Court in Reno found not to be encompassed by § 1252(g).  Reno, 525 U.S. at 482.

Petitioners' second set of claims, which challenge their removal to countries they allege are ill-equipped to receive them, do not fare as well under § 1252(g).  Petitioners argue that it would violate due process by releasing them into countries where COVID-19 is not controlled or where they will face persecution due to fear on the part of their compatriots that they are carrying the virus from the United States.  Unlike the claims based on the conditions of deportation, this challenge directly implicates the government's discretionary authority to return noncitizens to their native countries.  See Reno, 525 U.S. at 483–84 (noting that the decision to execute a removal order "represent[s] the initiation or prosecution of [a particular] stage[] in the deportation process" and that the "the Executive has discretion to abandon the endeavor" at that stage for "humanitarian reasons" or otherwise).  In determining whether to implement petitioners' removal orders, the government necessarily must decide whether to return them to their home countries.  Petitioners' contention that they would face danger in those same countries unavoidably calls into question that judgment, which, for better or worse, Congress has left to the exclusive province of the Executive branch.  See generally 8 U.S.C. § 1231(c)(2)(A)(i) ("The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that immediate removal is not practicable or proper.").[17]

Permitting judicial review of due process challenges to the conditions in petitioners' home countries could also open the door to impermissible relitigation of negative credible-fear

_____

[17] It also bears noting that the INA provides a separate procedure for petitioners to reopen removal proceedings on the basis that changed country conditions warrant relief.  See 8 U.S.C. § 1229a(c)(7)(C)(ii) (permitting noncitizens to file a belated motion to open removal proceedings "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding"); 8 C.F.R. § 1208.4(a)(4)(i)(A)–(B).

determinations.  Take, for example, a noncitizen with an expedited removal order who claims

that it would violate due process for ICE to release him into his home country because there is a

civil war raging there and he will be persecuted when he arrives.  If the presence of the civil war

was the factual basis for his rejected asylum application, his claims clearly would be barred.  In

ordering the noncitizen removed, the agency would necessarily have already rejected the

petitioner's claim that the civil war warranted asylum, and one of the primary purposes of the

INA's jurisdiction-stripping provisions is to prevent the relitigation of the agency's initial asylum

determinations.  See DHS v. Thuraissigiam, 140 S. Ct. 1959, 1966 (2020) ("A major objective of

[these provisions] was to 'protec[t] the Executive's discretion' from undue interference by the

courts; indeed, 'that can fairly be said to be the theme of the legislation.'" (quoting Reno, 525

U.S. at 486)).  Granted, petitioners' home-country claims here are not based on the same factual

predicate as their underlying asylum claims.  But, even though petitioners "may not be directly

questioning the agency's discretionary" decision to carry out their removal orders, the INA bars

review of claims that effectively do so.  C.G.B., 2020 WL 2935111, at *30 (citing Giammarco v.

Kerlikowske, 665 F. App'x 24, 26 (2d Cir. 2016) ("[B]ecause [the] petition for a writ of habeas

corpus ad testificandum essentially seeks to void discretionary decisions denying [a detainee] the

same relief, his petition is inextricably linked to those decisions," there is no "jurisdiction to

consider the merits of [the] habeas petition [under 8 U.S.C. § 1252(a)(2)(B)]." (citations

omitted))).

Because the decision to return petitioners to their home countries is part and parcel of

ICE's discretionary, unreviewable decision to execute their expedited removal orders, the Court

finds that § 1252(g) likely divests it of jurisdiction to hear petitioners' claims that exposing them to dangerous conditions in those countries would violate due process.[18]

### 3. The Suspension Clause

The final aspect of the Court's jurisdictional inquiry involves the Suspension Clause of the Constitution, which prohibits the political branches from "suspend[ing]" the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it," U.S. Const. Art. I, § IX, cl. 2.  Petitioners contend that if the Court were to hold that the INA bars jurisdiction over their claims, the statute would violate the Suspension Clause.  After the briefing on petitioners' motion was completed, the Supreme Court clarified that the Suspension Clause only protects "core" habeas claims, namely those that challenge present physical confinement. Thuraissigiam, 140 S. Ct. at 1970–71.  Here, petitioners seek a "non-core" application of the writ in that they "challenge[] something other than [their] present physical confinement." Rumsfeld v. Padilla, 542 U.S. 426, 438 (2004).  Indeed, they seek to stay their deportation and thereby remain in custody.  Accordingly, the INA's bar to judicial review of the petitioner's home-country claims does not implicate the Suspension Clause.

\* \* \*

Section 1252 is one of the most comprehensive jurisdiction-stripping statutes in the United State Code, yet some claims manage to escape its clutches.  Because the text of the INA does not clearly prohibit the Court from reviewing the constitutionality of the physical manner in

---

[18] Petitioners' home-country claims are also likely barred by § 1252(a)(2)(A)(i) for similar reasons.  Because the government has discretion to begin or suspend the execution of removal orders, these claims could be said to challenge the *fact* of deportation and therefore "aris[e] from or relat[e] to the implementation or operation of an order of removal" within the meaning of § 1252(a)(2)(A)(i).  See Jennings, 138 S. Ct. at 855 (Thomas, J., concurring in part).

which petitioners would be deported, the Court likely has jurisdiction to decide those claims.  On the other hand, petitioners' due-process claims based on conditions they might encounter in their home countries directly implicate the government's discretionary decision to carry out their removal orders such that the Court likely lacks jurisdiction over those claims.  The Court will therefore only analyze petitioners' likelihood of succeeding on the merits of their manner-of-deportation claims.

B.  Likelihood of Success on the Merits

Again, the petitioners claim that the manner of their contemplated deportations—specifically, their exposure to the risks of contracting COVID-19 during the transportation process—would violate both their Fifth Amendment due process rights and the APA.  The Court concludes that petitioners have not established a likelihood of success on the merits of their claim on either ground.

1. *Due Process*

Taking due process first, the government argues out of the blocks that petitioners do not have due process rights because they have not been lawfully admitted to the United States.  Gov't's Opp'n 21.  Not so.  The Supreme Court recently clarified that an asylum seeker with a negative credible-fear determination "has only those rights *regarding admission* that Congress has provided by statute."  Thuraissigiam, 140 S. Ct. at 1982–83 (emphasis added) (citing Landon v. Plasencia, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights *regarding his application*." (emphasis added)).  Petitioners here do not seek to vindicate procedural due process rights related to their asylum applications, which the Supreme Court has now expressly limited to the process provided by statute.  Rather, they are seeking to enforce substantive due

process rights based on what amounts to unconstitutional conditions of confinement during the removal process.  See id. at 2013 n.12 (Sotomayor, J., dissenting) ("Presumably a challenge to the length or conditions of confinement pending a hearing before an immigration judge falls outside of that class of cases.  Because respondent only sought promised asylum procedures, today's decision can extend no further than these claims for relief.").  The Court therefore finds that petitioners are entitled to due process in relation to the conditions attendant to their deportations.

The question, then, is whether the deporting the currently detained petitioners during the pandemic would likely offend due process.  This Court recently laid out the constitutional standards that apply to a conditions of confinement challenge brought by noncitizens in civil immigration detention:

> When the Government "takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being[.]"  DeShaney v. Winnebago Cnty. Dep't. of Social Serv., 489 U.S. 189, 199–200 (1989).  Confinement of a person in a way that "renders [her] unable to care for [her]self, and at the same time fails to provide for [her] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" violates the Eighth Amendment to the Constitution. Id.  Accordingly, the Eighth Amendment prohibits the Government from "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness."  Helling v. McKinney, 509 U.S. 25, 33 (1993).  While civil immigration detainees are protected by the Fifth Amendment's Due Process Clause, these Eighth Amendment protections nevertheless apply to them "because a [civil] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  Jones v. Wolf, No. 20-CV-361, 2020 WL 1643857, at *3 (W.D.N.Y. Apr. 2, 2020) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

> To assess whether conditions of confinement violates due process, courts consider whether the conditions "amount to punishment of the detainee."  Bell, 441 U.S. at 535.  Because civil immigration detainees, like pretrial criminal detainees, have not been convicted of any present crime, they "may not be subjected to punishment of any description."  Hardy v. District of Columbia, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992)).

> In determining whether conditions of confinement amount to punishment, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." <u>Bell</u>, 441 U.S. at 538.

<u>C.G.B.</u>, 2020 WL 2935111, at *22.  Because petitioners would remain in ICE's custody during the deportation process up to the point of their release into their home countries, the Court will apply this standard to their challenge to the conditions attendant to that process.[19]  The relevant inquiry, therefore, is whether the manner in which their deportations would be carried out is "rationally related to a legitimate nonpunitive governmental purpose or . . . appear[s] excessive in relation to that purpose."  <u>Kingsley</u>, 135 S. Ct. at 2373–74 (quoting <u>Bell</u>, 441 U.S. at 538).[20]

The government plainly has a legitimate interest in the enforcement of immigration laws, and Congress has deemed that interest to be furthered by expeditiously removing asylum seekers who have been found not to have a credible fear of persecution in their native countries.  <u>See, e.g.</u>, <u>Landon</u>, 459 U.S. at 34 ("The government's interest in efficient administration of the immigration laws at the border . . . is weighty.").  In <u>C.G.B.</u>, this Court considered whether the conditions of detention experienced by certain noncitizens at five ICE facilities across the country violated due process.  Finding that the conditions likely violated the due process rights of some, but not all, of the detainees, the Court explained that "the Constitution does not require

---

[19] Petitioners frame their claims under the higher "deliberate indifference" and "shocks the conscience" standards that apply in substantive due process cases where the government has a "special-relationship" with the plaintiff or has exposed him to "state-created danger."  <u>See, e.g.</u>, <u>Harris v. District of Columbia</u>, 932 F.2d 10, 14 (D.C. Cir. 1991); <u>Butera v. District of Columbia</u>, 235 F.3d 637, 649–51 (D.C. Cir. 2001).  Because, as discussed, their claims are unlikely to succeed under the lower standard set out in <u>C.G.B.</u>, they are necessarily likely to fail under these higher standards.

[20] Petitioners do not allege "an expressed intent to punish on the part of [ICE] officials."  <u>Bell</u>, 441 U.S. at 538 (internal quotation marks omitted).

ICE to reduce the risk of harm to zero." C.G.B., 2020 WL 2935111, at *23 (quoting Benavides v. Gartland, No. 20-cv-46, 2020 WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020)).  "If it did, then any detention that does not allow detainees to perfectly practice social distancing would be per se unconstitutional." Id.  The same reasoning applies to ICE's detention of deportees during the removal process.  Due process only requires ICE to provide petitioners with "reasonable safety," not perfect safety.  DeShaney, 489 U.S. at 200.

As noted previously, ICE has provided the Court sworn declarations, which carry a presumption of good faith, indicating that it has taken a series of reasonable precautions to mitigate the possibility that petitioners traveling from the Berks or Dilley facility will be exposed to COVID-19 during their journey home.  It will conduct verbal screenings and temperature checks of all deportees at each leg of the trip and prohibit anyone exhibiting COVID-19 symptoms from traveling further.  It will provide all travelers with hand sanitizer and masks, which they will be required to wear.  It has also arranged for dedicated charter flights and ground transportation for all trips, so no petitioner will be forced to congregate in commercial airports or travel in commercial vehicles or planes.  Each flight will carry a healthcare provider proficient in aviation medicine, who will conduct additional pre-removal visual screenings and distribute additional PPE as needed.  And ICE has committed to segregating families from individuals on flights and limiting the number of passengers on any given flight to allow for physical distancing "to the extent possible."

Still, as ICE itself acknowledges, these preventative measures will not eliminate the risk of exposure altogether.  Petitioners correctly note that ICE's inability to ensure complete compliance with CDC's social distancing guidelines will increase their risk of exposure to some extent.  They also stress that ICE's failure to test every deportee (in lieu of symptom-based

screening) makes it possible that asymptomatic COVID carriers will be traveling alongside non-infected petitioners.  Again, however, due process does not demand zero risk.  It only requires ICE to ensure its detainees reasonably safe conditions.  The Court is persuaded that with the precautions it has adopted, ICE has met that standard.  While the CDC has recommended against all non-essential travel during the pandemic, it has not suggested that travel be banned entirely.  Consistent with that guidance, commercial airlines have continued to operate during the pandemic.  And the conditions that thousands of commercial air travelers currently experience every day (albeit mostly voluntarily)—required masks but no guarantee of an unoccupied adjacent seat or row and no COVID testing—are comparable to those that petitioners would face on ICE charter flights.  See Dep't of Transp., et al., Runway to Recovery, at 29–30 (July 2020).

More importantly, the Court must assess the conditions that petitioners would experience during the deportation process relative to those they would continue to face were the Court to grant the requested stay.  While the parties have not provided the Court with any information on the prevalence of the virus or ICE's prevention efforts at the Berks and Dilley facilities, petitioners' counsel are actively pursuing litigation against ICE elsewhere in this court on behalf of detainees at both facilities over their alleged non-compliance with CDC's COVID-19 guidelines.  See Petition & Complaint at 3, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (filed D.D.C. Mar. 21, 2020) (alleging that ICE has "failed to provide education to Petitioners and individuals employed at the [facilities], ensure that minimum basic necessities such as soap or hand sanitizer are provided, and ensure that is possible to achieve the critical need for social distancing").  Indeed, Judge Dolly Gee in the Central District of California recently found that detainees at ICE's family residential centers, including at Berks and Dilley, are at a high risk for COVID-19.  Flores v. Barr, No. 85-cv-4544, 2020 WL 3488040, at *1 (C.D. Cal. June 26, 2020).  She

specifically found that that "individuals living in congregate settings are more vulnerable to the virus," that "four employees at Dilley already have tested positive," that there have been "recent increases in COVID-19 infection rates in the counties in which . . . Dilley [is] located," and that "six children were afflicted with viral stomatitis in or about April 2020, further demonstrating the ease with which contagion can spread in congregate settings." Id. Likewise, while petitioners note the purported risk associated with comingling deportees from multiple facilities during the deportation process, similar risk exists within the detention centers. The populations of the centers are in flux, detainees are not tested on a routine basis, and staff come and go daily. Petitioners therefore have not shown that commingling during the removal process would increase their exposure to the virus beyond what it is now, let alone to such an extent that would violate constitutional due process.

The bottom line is that the risks of the removal process cannot be assessed a vacuum. Rather, the Court must ask whether it is reasonable for ICE to expose petitioners to the temporary risks of traveling as compared to the indefinite risks of remaining in congregate detention facilities with transient detainee populations who have not all been tested for the virus and staff entering and leaving every day. Viewed from that perspective, the Court has little difficulty concluding that petitioners are not likely to show that ICE will subject them to an unreasonable health risk by carrying out their removals with the precautionary measures ICE has committed to taking.

## 2. Administrative Procedure Act

Petitioners also contend that their removal during the pandemic would violate the APA. They root their APA claim in United States ex rel. Accardi v. Shaughnessy ("Accardi"), where the Supreme Court vacated a deportation order that was issued in a manner that did not comply

with "[r]egulations [that] prescribe[d] the procedure to be followed in processing an alien's application for suspension of deportation."  347 U.S. 260, 265 (1954).  "Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."  Battle v. FAA, 393 F.3d 1330, 1336 (D.C. Cir. 2005).  Rules that fall within Accardi's ambit include "internal agency guidance" that are "intended" to be "binding norm[s]."  Damus v. Nielsen, 313 F. Supp. 3d 317, 336 (quoting Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987)).  Petitioners contend that, under Accardi, ICE's failure to follow CDC guidance and its own policies in responding to the COVID-19 pandemic is arbitrary and capricious.  Am. Pet'n & Compl. ¶¶ 287–98.  The government responds that petitioners do not challenge the type of regulation encompassed by Accardi and that, regardless, they have not shown that ICE is violating the guidelines.  The Court agrees that petitioners' claims fall outside the Accardi doctrine.

As this Court recently explained, "agency regulations do not create *substantive* due process rights."  C.G.B., 2020 WL 2935111, at *34 (emphasis in original).  Accardi is instead "rooted instead in notions of *procedural* due process."  Id. (emphasis in original) (citing Lopez v. FAA, 318 F.3d 242, 246 (D.C. Cir. 2003); Thomas W. Merrill, The Accardi Principle, 74 Geo. Wash. L. Rev. 569, 577 (2006) (noting that all post-1950s Supreme Court cases "that reference the Accardi principle . . . involve procedural as opposed to substantive regulations.")).  In Damus v. Neilson, for example, the court held that plaintiffs could challenge ICE's failure to comply its own Parole Directive, which imposed "a number of procedural requirements for assessing asylum-seekers' eligibility for release," including "an opportunity to submit documentation, the availability of an individualized parole interview, and an explanation of the reasons for a parole denial."  313 F. Supp. 3d at 324, 337; see also Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 151

(D.D.C. 2018) (recognizing an <u>Accardi</u> claim related to a policy that "establishe[d] procedural rights for asylum seekers in connection with the parole process").  The guidelines involved here, conversely, set out substantive standards for how to handle the COVID-19 crisis.  But because <u>Accardi</u> does not create substantive rights, petitioners cannot rely on the APA to enforce the government's adherence to CDC guidelines or its own internal guidance during their removals.  Petitioners therefore have not established likelihood of success on the merits of their APA claim.

C.  <u>Irreparable Injury</u>

Moving to the irreparable injury prong of the TRO analysis, deportation pursuant to a valid removal order is "not categorically irreparable."  <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).  That is, "the burden of removal *alone* cannot constitute the requisite irreparable injury."  <u>Id.</u> (emphasis added).  The Supreme Court explained that noncitizens were not irreparably harmed when they could "continue to pursue their petitions for review" after removal and, if they prevailed, could "be afforded effective relief by facilitation of their return."  <u>Id.</u>  Here, however, removal during the pandemic would effectively foreclose this petition from review; petitioners obviously could not challenge the legality of the conditions of their deportation during a pandemic *after* they have been removed.  Even if they could, the Court would not be able to afford them effective relief.  Petitioners have, therefore, demonstrated irreparable harm in that regard.[21]

---

[21] While the Court finds petitioners have shown irreparable harm insofar as they would be unable to mount their challenge absent a stay, as discussed above in connection with the merits prong of the TRO analysis, they have failed to show that the alleged harm associated with the deportation process would be any greater than the present harm inside the Dilley and Berks facilities.  In fact, it may well be less.

D.  Balance of the Equities and the Public Interest

When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge.  See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).  There are equities and public interests on both sides of the scale here.  As the Supreme Court has noted, "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and 'permit[s] and prolong[s] a continuing violation of United States law.'"  Nken, 556 U.S. at 436 (quoting Reno, 525 U.S. at 490).  But that interest is not as strong where, as here, petitioners "are not being removed because they violated the law."  M.M.V., 2020 WL 2119744, at *3.  Nor is it as strong, perhaps, where legitimate concerns have been raised over the circumstances surrounding the denial of petitioners' asylum petitions.  Id. (referencing a number of "troubling" circumstances surrounding petitioners' applications—including the application of the Transit Ban, adversarial interviews, negative social media posts by interviewing officers, and the failure to apply the most favorable circuit precedent—that the court did not have jurisdiction to review); see also M.M.V., 2020 WL 1984309, at *4–6, 12–16.  The Supreme Court has also recognized that there is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  Nken, 556 U.S. at 436.  Absent a TRO staying their removal, petitioners will very likely be deported during a worldwide pandemic, exposing them to at least some risk of contracting the virus along the way.  It is in the public interest to avoid or reduce that risk.  As discussed above, however, petitioners' deportation could potentially reduce their overall COVID exposure by removing them from congregate detention facilities that have been found not to comply with relevant CDC guidelines.  Lowering the

capacity of those facilities would also curtail the remaining detainees' exposure to the virus, which is also in the public interest.  Weighing these factors, the Court cannot say that balance tips decidedly towards one party or the other.

* * *

While petitioners will suffer irreparable harm insofar as they will not be able to mount this challenge after their deportation, because they are unlikely to succeed on the merits and the other two factors do not "'clearly favor[]' granting the injunction," Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009), the Court must decline to enter a temporary restraining order and will lift the administrative stay of removal.

## IV.   Venue

Finally, the government asks the Court to transfer venue after denying petitioners' TRO motion because the so-called immediate physical custody rule requires habeas petitions to be heard in the district where the detainees are held.  Opp'n  36.  It also maintains that "this case presents a local controversy related to ICE removal operations" and should be transferred "to a district where one of the Family Residential Centers [at issue] are located (i.e., the Southern District of Texas or Eastern District of Pennsylvania)."  Id.  Petitioners respond that the immediate physical custody rule only applies to core habeas petitions challenging detention itself as unlawful and seeking release.  Reply 30 (citing Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004)).  They say that non-core claims, like those here, need not follow that rule.  Id.

Petitioners are generally correct.  The Supreme Court has held that core habeas claims must follow the physical custody rule but that the rule should not be so rigidly applied to non-core claims.  Padilla, 542 U.S. at 435.  For non-core petitions, courts "have relied on traditional venue considerations such as the location of material events, the location of records and

witnesses pertinent to the claim, and the relative convenience of the forum for each party."

<u>S.N.C. v. Sessions</u>, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018) (internal quotation marks

omitted).  At this juncture, however, the Court lacks sufficient information to decide whether the

District of Columbia is the most appropriate venue.  The government has not formally moved for

transfer and the cursory discussion of the issue in its opposition brief does not confront all the

factors relevant to customary venue considerations under 28 U.S.C. § 1404(a).  The Court

therefore will defer consideration of venue until such a motion is made.

**V.    Conclusion**

While the Court concludes that petitioners have not satisfied the exacting standard

required for the issuance of a TRO, it will remind the government that, whatever circumstances

brought the petitioners to this country, they are now in our care and will remain so until they

reach their home countries.  For that reason alone, the government has a duty to carry out their

lawful removal in as safe and humane a fashion as possible.  The Court has accepted ICE's

representations that is has implemented preventative measures to reduce the risk of COVID

exposure during petitioners' journeys.  It expects them to be followed.  The Court also urges ICE

not to spare expense or cut corners in the transportation process, such as by unnecessarily filling

buses and planes to their full capacity.  The law may require petitioners' removal to be

"expedited," but it does not demand that it be so hurried or incautious as to jeopardize their

wellbeing.

That said, and for the foregoing reasons, the Court must deny Petitioners' Motion for a

Temporary Restraining Order and lift the administrative stay.  A separate Order shall follow.


Date:  <u>July 23, 2020</u>

                                                _____
                                                CHRISTOPHER R. COOPER
                                                United States District Judge