**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **D.A.M.,** *et al.*, |
| Petitioners, |
| v. |
| **WILLIAM BARR** in his official capacity as Attorney General of the United States, *et al.*, |
| Respondents. |

Case No. 20-cv-1321 (CRC)

## MEMORANDUM OPINION

Petitioners in this case are asylum seekers from several countries who were issued orders of expedited removal after entering the United States. Most of the petitioners were denied asylum pursuant to an interim rule known as the "Transit Ban." Petitioners originally sought a writ of habeas corpus and a temporary restraining order ("TRO") preventing Immigration and Customs Enforcement ("ICE") from carrying out their removal during the COVID-19 pandemic. Doing so, petitioners argued, would expose them to attendant health risks in violation of their substantive due process rights. The Court denied the TRO motion. While the habeas petition was pending before this Court, however, another court in this district vacated the Transit Ban, finding that it was improperly promulgated under the Administrative Procedure Act ("APA"). Petitioners then amended their habeas petition, adding a claim that the vacatur of the Transit Ban makes it unlawful for the government to remove them without affording them all the procedures that were available to asylum seekers prior to the Transit Ban's issuance. Petitioners have now filed a second TRO motion to block their imminent deportation on that basis.

In the abstract, there may well be merit to petitioners' contention that deporting them based on removal orders issued under the now-vacated Transit Ban would violate their due

process rights.  However, the Court concludes that it very likely lacks jurisdiction to rule on this issue.  Petitioners' claim is ultimately a challenge to the implementation of their final orders of expedited removal.  With limited exceptions that do not apply here, Congress has specifically barred such claims under 8 U.S.C. § 1252, the section of the Immigration and Nationality Act ("INA") limiting judicial review of removal orders.  That policy choice is consistent with the Suspension Clause of the Constitution, even if it sometimes produces troubling results. Petitioners therefore are not likely to succeed on the merits of their Transit Ban claims, and the other TRO factors do not outweigh their failure to show a likelihood of success.  Accordingly, the Court will deny the pending TRO motion and lift the administrative stay of removal that the Court imposed while the motion was pending.

## I.   Background

Much of the background relevant to this case was set forth in an earlier Memorandum Opinion denying petitioners' first TRO motion.  See <u>D.A.M. v. Barr</u> ("<u>D.A.M. I</u>"), No. 20-cv-1321 (CRC), 2020 WL 4218003 (D.D.C. July 23, 2020).  Here, the Court will review only what is necessary for purposes of the present motion.

### A.   <u>Petitioners' Administrative Proceedings</u>

Petitioners are families from Guatemala, Honduras, El Salvador, Haiti, Mexico, Ecuador, Brazil, Colombia, Chile, Nicaragua, and Peru.  They traveled to the U.S. without valid entry documents and asserted that they were seeking protection from persecution in their home countries.

Upon their arrival in the U.S., petitioners were placed into expedited removal proceedings under 8 U.S.C. § 1225(b).  In the expedited removal process, arriving noncitizens without valid entry documents who indicate no intention to apply for asylum or fear of

2

persecution are issued orders of removal "without further hearing or review."  8 U.S.C. §
1225(b)(1)(A)(i).  Those who do seek asylum or express fear of persecution are interviewed by
an asylum officer.  Id. § 1225(b)(1)(A)(ii).  The asylum officer determines whether the
noncitizen has demonstrated a "credible fear of persecution"—i.e., "a significant possibility . . .
that the alien could establish eligibility for asylum."  Id. § 1225(b)(1)(B)(v).  If the asylum
officer finds no credible fear, the noncitizen is denied asylum and issued an order of removal,
which is subject to expedited review by an immigration judge.  Id. § 1225(b)(1)(B)(iii).  In
addition to pursuing asylum, noncitizens may seek withholding of removal under § 241(b)(3)(B)
of the INA or the Convention Against Torture ("CAT").  See 8 C.F.R. § 1208.16(a).  But to
obtain withholding of removal on those bases, noncitizens must meet a significantly higher
standard than "credible fear."  Specifically, noncitizens seeking withholding of removal under
the CAT must show that they are "more likely than not" to be tortured if removed.  Id. §
1208.16(c)(2).  Those seeking withholding of removal under § 241(b)(3) of the INA similarly
must show that they are "more likely than not" to be persecuted on a protected ground in the
future, or that they have suffered such persecution in the past.  Id. § 1208.16(b).

      Petitioners here were determined to lack a credible fear of persecution.  However, the
process through which most of the petitioners received these determinations differed from the
usual process under 8 U.S.C. § 1225(b).  Specifically, most of the petitioners were subjected to
the so-called Transit Ban, an interim rule jointly issued last year by the Department of Homeland
Security ("DHS") and the Department of Justice ("DOJ"). [1]  With limited exceptions, the Transit

_____

      [1] Petitioners refer to those of them who were subjected to the Transit Ban as the "Transit
Ban Petitioners."  For convenience, this Memorandum Opinion generally refers to the Transit
Ban Petitioners simply as "petitioners," except where it is necessary to distinguish them from the
few petitioners who were not subjected to the Transit Ban.

Ban rendered migrants seeking admission to the U.S. at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled.  Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,835 (July 16, 2019).  Therefore, for petitioners covered by the Transit Ban, asylum officers automatically made negative credible-fear determinations, regardless of how likely it appeared that those petitioners would face persecution after removal.  Petitioners thus faced expedited removal unless they could satisfy the higher standard for withholding of removal under INA § 241(b)(3) or the CAT.

Ultimately, each petitioner was issued an order of expedited removal.  Many of them are now being detained by ICE at either the South Texas Family Residential Facility in Dilley, Texas or the Berks County Residential Center in Leesport, Pennsylvania.  Others have been released for medical or other reasons.

B.  <u>Procedural History</u>

1.  *Surrounding Litigation*

Two other recent actions in this district provide necessary context for the present suit.

a.  <u>CAIR v. Trump</u>

Shortly after DHS and DOJ promulgated the Transit Ban, immigrant-services organizations filed a lawsuit challenging the interim rule under the APA.  The plaintiffs claimed that the Transit Ban was arbitrary and capricious, that it violated the INA, and that it was improperly issued without notice-and-comment procedures.  <u>Capital Area Immigrants' Rights Coal. v. Trump</u> ("<u>CAIR</u>"), No. 19-cv-2117 (TJK), 2020 WL 3542481, at *1 (D.D.C. Jun. 30, 2020).

In June 2020, Judge Timothy Kelly granted summary judgment for the plaintiffs, finding that the government's failure to advance the interim rule through notice-and-comment procedures rendered it invalid under the APA.  Id.  As a remedy, Judge Kelly vacated the Transit Ban.  In doing so, he rejected the government's argument that the court should limit any relief to the parties in CAIR.  Id. at *22.  He also concluded that vacatur of the interim rule would "not result in prohibitively disruptive consequences," partly because the southern border was already "effectively closed" to new asylum seekers due to the COVID-19 pandemic.  Id.  The government has appealed Judge Kelly's ruling to the D.C. Circuit.  Notice of Appeal, Capital Area Immigrants' Rights Coal. v. Trump, No. 19-cv-2117 (TJK) (D.D.C. Aug. 28, 2020).

### b.  M.M.V. v. Barr

Last year, a group of plaintiffs including some of the petitioners here filed a lawsuit challenging what they described as regulations, directives, and procedures adopted to implement the Transit Ban.  See M.M.V. v. Barr ("M.M.V. I"), No. 19-cv-2773 (ABJ), 2020 WL 1984309, at *1 (D.D.C. Apr. 27, 2020).  They invoked the court's jurisdiction under 8 U.S.C. § 1252(e)(3), which authorizes federal court challenges to "written" policies "implementing" the INA's expedited removal provisions under certain circumstances.  The case was initially assigned to Judge Kelly as related to CAIR.  However, Judge Kelly determined that the cases were not related, based in part on the M.M.V. plaintiffs' representation that their complaint did not challenge the Transit Ban itself.  Order at 2, M.M.V. v. Barr, No. 19-cv-2773 (TJK) (D.D.C. Sept. 25, 2019).  M.M.V. was then randomly reassigned to Judge Amy Berman Jackson.

In April 2020, Judge Jackson dismissed the bulk of the plaintiffs' claims, finding that most of the alleged policies that they challenged were not written and that the INA stripped the court of jurisdiction to review unwritten policies.  M.M.V. I, 2020 WL 1984309, at *10-*19.

She also denied several motions to join the suit by would-be plaintiffs (also petitioners here) because they either were not subject to the one written (and thus reviewable) policy or failed to challenge it within sixty days of its implementation, as required by the statute.  Id. at *20-*22.

Judge Jackson's ruling is now pending on appeal.  The D.C. Circuit denied an emergency motion to stay the plaintiffs' removals during the appeal.  Order, M.M.V. v. Barr, No. 20-5106 (D.C. Cir. May 15, 2020) (per curiam).

While the appeal in M.M.V. was pending, Judge Kelly issued his summary judgment decision in CAIR vacating the Transit Ban.  The M.M.V. plaintiffs then asked Judge Jackson to issue an indicative ruling that, if the case were remanded from the D.C. Circuit, the district court would "reconsider its jurisdiction in light of the Transit Ban's vacatur."  Mot. for Indicative Ruling at 5, M.M.V. v. Barr, No. 19-cv-2773 (ABJ) (D.D.C. July 20, 2020).  She declined. Assuming for argument's sake that the vacatur of the Transit Ban also nullified all procedures adopted to implement it, as the plaintiffs argued, Judge Jackson concluded that this development would not cure the jurisdictional defect she had identified.  On the contrary, it "would leave the Court with nothing to review."  Order at 4-5, M.M.V. v. Barr, No. 19-cv-2773 (ABJ) (D.D.C. Aug. 19, 2020).[2]

2. *Proceedings in this Case*

Petitioners filed this petition for habeas corpus and complaint on May 18, 2020, one business day after the D.C. Circuit denied an emergency stay and cleared the way for ICE to

---

[2] Aside from this case and M.M.V., there is at least one more pending case in this district involving some of the petitioners here.  Some of the petitioners are plaintiffs in a lawsuit before Judge James E. Boasberg, alleging that ICE is unconstitutionally failing to protect detainees in three family residential centers from COVID-19.  See O.M.G. v. Wolf, No. 20-cv-786 (JEB), 2020 WL 4201635, at *2 (D.D.C. July 22, 2020).  Judge Boasberg denied the plaintiffs' motion for a preliminary injunction requiring their release.  Id. at *13.

deport the M.M.V. plaintiffs.  The petition and complaint, as originally filed, alleged that the government would violate the Constitution and the APA by removing petitioners during the COVID-19 pandemic and exposing them to the attendant health risks.  See Pet'n & Compl. Petitioners immediately moved for a TRO to halt their deportation.  Mot. for TRO, ECF No. 6.

The initial TRO motion was pending when Judge Kelly vacated the Transit Ban in CAIR. Petitioners promptly amended their habeas petition and complaint to add a claim that those petitioners who were subjected to the Transit Ban did not have lawful orders of removal and thus could not be removed without further process.  Am. Pet'n & Compl. ¶¶ 299-310.  Petitioners did not, however, seek to amend their pending TRO motion to add their new claim as a ground for emergency relief.

On July 23, 2020, this Court denied the initial TRO motion, finding that the claims underlying that motion were unlikely to succeed on the merits.  The Court separately analyzed two types of claims petitioners raised:  claims challenging the conditions they would face during their removal and claims based on the conditions they would face in their countries of origin after removal.  As to the former, the Court found that it likely had jurisdiction, but that petitioners did not carry their burden to show that the government would likely violate the Fifth Amendment or the APA by exposing them to the dangers inherent in removal during the pandemic.  D.A.M. I, 2020 WL 4218003, at *10.  As to the latter claims, the Court concluded that it likely lacked jurisdiction under 8 U.S.C. § 1252(g), which generally bars claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders."  As the Court explained, the government's "decision to return petitioners to their home countries" despite the alleged dangers in those countries "is part and parcel of ICE's discretionary, unreviewable decision to execute their expedited removal orders."

D.A.M. I, 2020 WL 4218003, at *10.  "[F]or similar reasons," the Court found that 8 U.S.C.

§ 1252(a)(2)(A)(i)—which generally bars claims "arising from or relating to the implementation

or operation of an order of [expedited] removal"—likely provided an additional basis to find that

that Court lacked jurisdiction over petitioners' home-country-conditions claims. Id. at *10 n.18.

Within hours of that ruling, petitioners filed the instant TRO motion, now seeking to stay

their removals in light of the vacatur of the Transit Ban.  The Court administratively stayed

petitioners' removals pending the resolution of this motion.  Min. Order (July 23, 2020).

On August 6, the Court held a hearing on the motion by videoconference.  During the

hearing, the Court invited the parties to file supplemental briefs regarding Patel v. Barr, No. 20-

cv-922, 2020 WL 4282051 (E.D. Pa. July 27, 2020), a recent decision holding that,

notwithstanding CAIR, 8 U.S.C. § 1252 barred an action challenging the government's denial of

asylum to three noncitizens under the Transit Ban.  The parties timely filed those supplemental

briefs, and the second TRO motion is now ripe for resolution.

## II.   Legal Standards

"A TRO is an extraordinary remedy and should be granted sparingly."  Basel Action

Network v. Mar. Admin., 285 F. Supp. 2d 58, 60 (D.D.C. 2003).  To obtain a TRO, the moving

party must show: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to

suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

his favor; and (4) that a TRO is in the public interest.  See Winter v. Nat. Res. Def. Council, 555

U.S. 7, 20 (2008); Hall v. Johnson, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard

applies to both temporary restraining orders and to preliminary injunctions.").  An absence of

irreparable injury is fatal to a TRO motion.  Chaplaincy of Full Gospel Churches v. England, 454

F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit has suggested, without holding, that the failure

8

to establish a likelihood of success on the merits also categorically forecloses preliminary relief. Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011).

Before reaching the merits, the Court should ensure that it has jurisdiction to consider petitioners' claims. Courts evaluate whether they have jurisdiction through the lens of the standard applicable at each stage of litigation. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). For example, "a party who fails to show a 'substantial likelihood' of standing is not entitled to a" temporary restraining order. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). "That same reasoning . . . extends to other jurisdictional prerequisites." Cal. Ass'n of Private Postsecondary Schs. v. DeVos, 344 F. Supp. 3d 158, 167 (D.D.C. 2018). Thus, "[a]s part of establishing a likelihood of success on the merits, the [petitioners] must first demonstrate a likelihood of success in establishing jurisdiction." Make the Rd. N.Y. v. Wolf, 962 F.3d 612, 623 (D.C. Cir. 2020).

### III. Analysis

#### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, petitioners must first show that the Court likely has jurisdiction to grant the ultimate relief they seek.

In assessing its jurisdiction, the Court begins with the presumption that agency action is judicially reviewable. Id. at 623-24. Even so, petitioners face a formidable challenge in establishing jurisdiction because 8 U.S.C. § 1252, which governs judicial review of removal orders, "is one of the most comprehensive jurisdiction-stripping statutes in the United States Code." D.A.M. I, 2020 WL 4218003, at *10.

Petitioners make essentially three arguments in their effort to establish jurisdiction. *First*, they argue that their claim does not fall within the scope of 8 U.S.C. § 1252(a)(2)(A)—which,

9

except for a limited number of claims described in 8 U.S.C. § 1252(e), bars judicial review of any claim "arising from or relating to the implementation or operation of" expedited removal orders.  As a result, petitioners assert, this case should be treated as an ordinary habeas petition within the Court's federal-question jurisdiction.  *Second*, they argue that if their claim does fall within the scope of § 1252(a)(2)(A), the Court nevertheless has jurisdiction under § 1252(e) because the claim involves a determination of whether petitioners' removal orders were validly issued, which § 1252(e) permits.  *Third*, they argue that, insofar as § 1252 does purport to deprive the Court of jurisdiction over the claim at issue here, it violates the Suspension Clause of the Constitution, which prohibits Congress from limiting certain types of habeas claims except in extraordinary circumstances.  The Court cannot accept any of these arguments and therefore finds that it likely lacks jurisdiction.

      1.  *Section 1252(a)(2)(A)*

Petitioners' principal argument is that the jurisdiction-stripping provisions of § 1252 do not cover their claim, so the Court can exercise jurisdiction without resorting to § 1252(e) or the Suspension Clause.  The Court disagrees.  Petitioners' claim falls within the scope of § 1252(a)(2)(A),[3] and therefore the Court has no jurisdiction unless specifically granted by § 1252(e) or guaranteed by the Constitution.

Section 1252(a)(2)(A) limits judicial review of orders of expedited removal issued under 8 U.S.C. § 1225(b)(1).  It provides in relevant part:

      (2) Matters not subject to judicial review.

---

[3] The parties also dispute whether petitioners' claim is covered by § 1252(g), which prohibits courts from hearing any claim "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders."  8 U.S.C. § 1252(g).  Because the Court finds that §§ 1252(a)(2)(A) and 1252(e) likely bar petitioners' claim, it is not necessary to decide whether § 1252(g) also deprives the Court of jurisdiction.

> (A) Review relating to section 1225(b)(1).  Notwithstanding any
> other provision of law (statutory or nonstatutory), including
> section 2241 of title 28, or any other habeas corpus provision,
> and sections 1361 and 1651 of such title, no court shall have
> jurisdiction to review—
>
> (i)    except as provided in [8 U.S.C. § 1252(e)], any
>        individual determination or to entertain any other cause
>        or claim arising from or relating to the implementation
>        or operation of an order of removal pursuant to [8
>        U.S.C. § 1225(b)(1)].

8 U.S.C. § 1252(a)(2)(A)(i).[4]

As the Court has explained, § 1252(a)(2)(A) "gives the government virtually

unreviewable authority to decide whether and when to implement the petitioners' removal

---

[4] Section 1252(a)(2)(A) goes on to strip courts of jurisdiction to review

> (ii) except as provided in subsection (e), a decision by the Attorney General to
> invoke the provisions of [8 U.S.C. § 1225(b)(1)],
>
> (iii) the application of such section to individual aliens, including the
> determination made under [8 U.S.C. § 1225(b)(1)(B)], [and]
>
> (iv) except as provided in subsection (e), procedures and policies adopted by the
> Attorney General to implement the provisions of [8 U.S.C. § 1225(b)(1)].

8 U.S.C. § 1252(a)(2)(A)(ii)-(iv).

At the hearing on the present motion, government counsel argued that
§ 1252(a)(2)(A)(iii) bars petitioners' claim.  Hearing Tr. 59.  The Court disagrees.  Section
1252(a)(2)(A)(iii) "forbids review of individual aliens' credible-fear determinations, not suits . . .
that challenge credible-fear policies on their face."  Grace v. Barr, 965 F.3d 883, 892 (D.C. Cir.
2020).  Strictly speaking, petitioners' claim here is neither an attempt to relitigate individual
credible-fear determinations nor a facial challenge to the Transit Ban.  But their claim has much
more in common with the latter category than the former.  At bottom, petitioners argue they
cannot be removed because their removal orders were issued pursuant to a now-invalidated
agency policy.  Like the asylum seekers who successfully invoked the court's jurisdiction in
Grace, petitioners here are not asking the Court to "examine how USCIS officers 'appl[ied]' the
challenged policies 'to individual aliens.'"  Id. at 893 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)).

orders." <u>D.A.M. I</u>, 2020 WL 4218003, at *8.  But, petitioners argue that § 1252(a)(2)(A) does not apply here because they are not challenging the implementation or operation of their removal orders.  Instead, petitioners say, "their Due Process Claims are collateral challenges to unconstitutional practices and policies used by Respondents in seeking to remove the Transit Ban Petitioners from the United States prior to the exhaustion of their right to any form of constitutionally adequate lawful process."  Reply 5-6.  More specifically, their claim is that because <u>CAIR</u> vacated the Transit Ban, they have procedural and substantive due process rights to access the congressionally created pre-removal process they would have received if the Transit Ban had never existed.  <u>Id.</u>

　　　　To determine whether § 1252(a)(2)(A) applies to this claim, the Court must first answer a threshold question:  Are there currently existing orders of removal as to petitioners?  Petitioners' position on this question is something of a moving target.  Their briefs sometimes suggest that they do not have outstanding removal orders because <u>CAIR</u> wiped those orders out of legal existence.  <u>See</u> Mot. for TRO ("TRO II Mot."), ECF No. 35 at 14 ("[T]he Transit Ban Petitioners do not seek to either vacate their removal orders (which have been vacated pursuant to <u>CAIR</u>), but rather, they contest their removal until they engage in meaningful process to which they are entitled."); Pet'rs' Suppl. Mem. 3 ("Because, in effect, the Transit Ban Petitioners have no negative credible fear determinations, much less review by an Immigration Judge, their orders of removal are not final or executable, and do not justify removal.").  Elsewhere, petitioners appear to concede that they do have removal orders outstanding.  <u>See</u> Pet'rs' Suppl. Mem. 2 ("Respondents . . . erroneously assert[] that the Transit Ban Petitioners have asked this Court to rule 'that their orders must be deemed void[.]'  That is a mischaracterization of their claims." (quoting Resp'ts' Suppl. Mem. 4)).

After careful consideration, the Court is persuaded that petitioners' removal orders do still exist in a legal sense.  Insofar as petitioners argue otherwise, they read too much into the vacatur of the Transit Ban.  Judge Kelly did not specify that his judgment would vacate existing orders of removal procured under the Transit Ban.  See CAIR, 2020 WL 3542481.  He did decline to limit the scope of relief to the parties before him, id. at *22, but it does not necessarily follow that Judge Kelly meant to set aside every removal order previously procured under the Transit Ban, which the government estimates to number into the thousands.  See Hearing Tr., ECF No. 43 at 24.  Indeed, some language in the opinion suggests that Judge Kelly's focus was on how vacating the rule would affect *future* agency adjudications, not past ones.  See CAIR, 2020 WL 3542481 at *22 ("[T]hat recent pandemic-related administrative action appears to have effectively closed the southern border indefinitely to aliens seeking asylum only underscores that vacatur of the Rule will not result in prohibitively disruptive consequences.").

Nor do general administrative law principles compel the conclusion that petitioners' removal orders no longer exist.  On the contrary, a judicial order vacating an agency rule does not *automatically* void every decision the agency made pursuant to the invalid rule.  A recent immigration case from this district illustrates the point.  In L.M.-M. v. Cuccinelli, Judge Randolph D. Moss vacated certain U.S. Citizenship and Immigration Services policy directives on asylum.  442 F. Supp. 3d 1, 34 (D.D.C. 2020).  Judge Moss then proceeded to a separate analysis of whether to vacate removal orders issued to individual noncitizens under the invalid directives.  He concluded that the plaintiffs' own removal orders should be vacated, but specifically declined to vacate the removal orders of similarly situated nonparties.  Id. at 36-37. This result would make little sense if the vacatur of the policy directives automatically voided all removal orders issued under those directives.

Courts in non-immigration cases similarly distinguish between vacating a rule and vacating agency action taken under that rule.  See, e.g., Waterkeeper Alliance, Inc. v. Wheeler, No. 18-cv-2230 (JDB), 2020 WL 1873564, at *6-*7 (D.D.C. Apr. 15, 2020) (partially vacating EPA approval of state regulatory program after the D.C. Circuit separately vacated an EPA policy that was essential to the approval); Western Watersheds Project v. Zinke, 441 F. Supp. 3d 1042, 1085-89 (D. Idaho 2020) (vacating a Bureau of Land Management policy, then separately analyzing whether lease sales conducted under the vacated policy should themselves be vacated); cf. Daimler Trucks N. Am. LLC v. EPA, 745 F.3d 1212, 1215 (D.C. Cir. 2013) (noting that after the D.C. Circuit vacated an EPA interim rule, engine manufacturers litigated a separate case about whether certificates the EPA had issued under the invalid rule should be vacated).

As petitioners emphasize, see Reply 13-16, the law is clear that when a court vacates an agency rule, the vacatur applies to all regulated parties, not only those formally before the court. For example, in O.A. v. Trump, Judge Moss rejected the government's suggestion that his vacatur of a rule restricting asylum should be limited to the plaintiffs in the case.  404 F. Supp. 3d 109, 153 (D.D.C. 2019).  As he explained, "that contention is both at odds with settled precedent and difficult to comprehend. The D.C. Circuit has 'made clear that [w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual petitioners is proscribed*.'"  Id. (quoting Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); see also Make the Rd. N.Y. v. McAleenan, 405 F. Supp. 3d 1, 68 (D.D.C. 2019) (the practice of applying vacatur beyond the litigants "reflects a common-sense understanding of what it means for a court to determine, at the conclusion of a case, that a formerly binding legal act of one of the parties is null and void"), rev'd on other grounds sub nom. Make the Rd. N.Y. v. Wolf, 962

F.3d 612 (D.C. Cir. 2020).  The universal nature of vacatur means that after a court vacates an agency rule, the agency may not apply that rule *to anyone* in subsequent adjudicative decisions, even if those adjudications involve facts that predate the vacatur.  See Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("Just as an Article III court may not issue an advisory decision, it may not issue a decision for less than all seasons, for some citizens and not others, as an administrator shall later decide.").

But it is one thing to say that vacatur protects everyone from having an invalid rule applied to them in future adjudications, and quite another to say that vacatur erases from legal existence all *past* adjudications under the vacated rule.  Cf. Heartland By-Products, Inc. v. United States, 568 F.3d 1360, 1366-67 (Fed. Cir. 2009) (court's holding applies going forward, even to facts that predate the holding, but that "does not mean that final judicial or administrative decisions are to be reopened" if inconsistent with the new precedent).  Petitioners would blur this distinction, but there is little, if any, precedent for doing so.  While petitioners quote liberally from recent immigration cases in this district, see Reply 13-16, those cases do not address whether vacatur of an agency rule automatically voids agency decisions separate from the rule itself.  They merely reaffirm the long-held understanding that once a rule is vacated, it is vacated for everyone.  See O.A., 404 F. Supp. 3d at 153; Make the Rd. N.Y. v. McAleenan, 405 F. Supp. 3d at 71 (rejecting argument that, after vacatur, the agency should be allowed to "apply the invalid rule with respect to any person who is not the individual who filed the legal action that is before the Court").  Similarly, petitioners cite a line of cases for the proposition that "[w]hen a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect."  TRO II Mot. 18-19 (quoting Env't Def. v. Leavitt, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) and collecting similar cases).  But in each of these cases, vacatur simply restored the prior

*regulatory* status quo; the invalid rule was eliminated and replaced by any preexisting rule it had superseded.  See, e.g., Env't Def., 329 F. Supp. at 64 (vacatur of EPA rules restored the prior absence of such rules); Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (vacatur of rule would restore previous rule).

Perhaps the case that comes the closest to endorsing petitioners' understanding of vacatur is W.C. v. Bowen, 807 F.2d 1502 (9th Cir. 1987).  There, a class of Social Security claimants claimed that they received adverse agency decisions pursuant to an invalid rule.  The Ninth Circuit agreed that the plaintiffs' decisions were issued under a rule that violated the APA.  Id. at 1505.  The court therefore upheld an order vacating the class members' adverse decisions.  Id. at 1506.  In doing so, the court stated that "[a]gency action taken under a void rule has no legal effect."  Id. at 1505.  In isolation, this language would appear to provide some support for the view that vacatur of a rule voids all actions taken under the rule.  But as a whole, W.C. is better understood to stand for the uncontroversial proposition that, when a court with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision as a remedy.  See id. at 1505-06 (framing the issue as one of remedy).  The Court will not adopt the most literal reading of the isolated sentence from W.C. that petitioners quote, especially since that reading would conflict with more recent persuasive authority.  See, e.g., L.M.-M., 442 F. Supp. 3d at 36-37; Waterkeeper Alliance, 2020 WL 1873564, at *6-*7; Western Watersheds Project, 441 F. Supp. 3d at 1085-89.

In sum, Judge Kelly's order vacating the Transit Ban means the government cannot issue any more orders of removal under that rule, but it does not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished by operation of his judgment.

Having found that petitioners still have outstanding removal orders, the Court has little difficulty concluding that their claim falls within the ambit of § 1252(a)(2)(A).  In challenging the government's plan to deport them pursuant to their final orders of removal with allegedly inadequate process, petitioners necessarily challenge "the implementation or operation" of those orders.  8 U.S.C. § 1252(a)(2)(A)(i); see also Patel, 2020 WL 4282051, at *4 (claim that government wrongfully applied the Transit Ban in determining petitioner's asylum eligibility and issuing removal order "is not 'collateral' to the removal order because . . . regardless of its basis, [it] necessarily challenges the removal order"); Castro v. DHS, 835 F.3d 422, 428 n.8, 430-34 (3d Cir. 2016) (Section 1252(a)(2)(A) barred habeas petitions seeking to block expedited removal where asylum officers allegedly committed procedural errors and applied the wrong substantive standard for credible fear);  id. at 431-32 (collecting cases similarly interpreting § 1252's limits on review of expedited removal).

It makes no difference to frame the claim as a challenge to the "process" preceding petitioners' removal, rather than the removal itself.  *All* procedural due process claims target an alleged failure to provide adequate process, but they do so in order to prevent the wrongful deprivation of some substantive interest in life, liberty, or property.  See Orton Motor, Inc. v. HHS, 884 F.3d 1205, 1215 (D.C. Cir. 2018).  The constitutionally protected interest at risk of deprivation here is petitioners' liberty interest in not being deported—that is, not having their orders of removal implemented.  Nor does the fact that petitioners raise a substantive due process theory put them beyond the reach of § 1252(a)(2)(A).  The action that petitioners characterize as a substantive due process violation is "Respondents' unjustified and unlawful decision to proceed with removal" at this time—in other words, respondents' implementation of their removal orders.  TRO II Mot. 21.

The conclusion that § 1252(a)(2)(A) applies to petitioners' Transit Ban claim is fully consistent with this Court's reasoning in D.A.M. I.  There, the Court found that § 1252(a)(2)(A) likely did not bar challenges to the physical conditions petitioners would face during the removal process, because such claims "do not challenge the *fact* of their removals." 2020 WL 4218003, at *8.  However, petitioners' claims related to the conditions in their home countries likely *did* fall within the scope of § 1252(a)(2)(A), because "these claims could be said to challenge the *fact* of deportation."  Id. at *10 n.18.  Petitioners' Transit Ban claim similarly challenges the fact of their removal.

For the same reason, the present motion is distinguishable from other cases petitioners cite in which courts exercised jurisdiction over challenges to governmental conduct that was collateral to removal itself.  For example, in You v. Nielsen, the court had jurisdiction because "the habeas petition [did] not challenge the discrete decision to remove" the petitioner, but the government's conduct in connection with the removal process—specifically, its choice to arrest and detain the petitioner at his green card interview, years after his removal order was issued. 321 F. Supp. 3d 451, 455-57 (S.D.N.Y. 2018).  As the court explained, "Respondents are empowered to remove Petitioner at their discretion.  But they cannot do so in any manner they please."  Id. at 457; see also Jennings v. Rodriguez, 138 S. Ct. 830, 839-40 (2018) (plurality) (finding jurisdiction over challenge to prolonged immigration detention, where the challengers were "not asking for review of an order of removal; . . . challenging the decision to detain them in the first place or to seek removal; [or] challenging any part of the process by which their removability will be determined"); Michalski v. Decker, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (detention "is independent from the decision or action to commence a removal

proceeding" and therefore reviewable).[5]  Unlike in those cases, petitioners here claim that the

government may not lawfully implement their removal orders, not merely that the government's

preferred "manner" of removal is defective.  You, 321 F. Supp. 3d at 457.

---

[5] The courts in these cases did not directly analyze § 1252(a)(2)(A), focusing instead on other jurisdiction-stripping provisions that were more relevant to the facts presented.  But to the extent these cases distinguish collateral challenges to the government's conduct in connection with removal (which courts may review) from challenges to removal itself (over which courts lack jurisdiction), their logic applies in the § 1252(a)(2)(A) context.  See D.A.M. I, 2020 WL 4218003, at *7-*8.

There is, however, an important difference between § 1252(a)(2)(A) and § 1252(g), the jurisdiction-stripping provision at issue in several of the cases petitioners cite.  Section 1252(g) provides that, with limited exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  8 U.S.C. § 1252(g).  This subsection applies "only to three discrete actions"— commencing proceedings, adjudicating cases, and executing removal orders—"that the Attorney General may take," or decline to take, as a matter of prosecutorial discretion.  Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999); see also D.A.M. I, 2020 WL 4218003, at *9 (applying § 1252(g) to claims that "directly implicate[] the government's discretionary authority to return noncitizens to their native countries").  For example, § 1252(g) applies to selective enforcement claims, where a noncitizen accuses the government of discrimination in choosing among otherwise lawful deportations to pursue.  Reno, 525 U.S. at 485.  By contrast, if the government tries to remove a noncitizen under circumstances where removal is *not* within the Attorney General's prosecutorial discretion, § 1252(g) does not apply.  See Arce v. United States, 899 F.3d 796, 800 (9th Cir. 2018) (where government removed noncitizen in direct violation of a court order, § 1252(g) did not bar review because "his claims arise not from the execution of the removal order, but from the violation of [the] court's order," an act beyond the Attorney General's authority); Fatty v. Nielsen, NO. C17-1535-MJP, 2018 WL 3491278, at *2 (W.D. Wash. July 20, 2018) (Section 1252(g) does not bar review of "collateral legal and constitutional challenges to the process by which the government seeks to remove" a noncitizen); Calderon v. Sessions, 330 F. Supp. 3d 944, 954 (S.D.N.Y. 2018) (challenge to government's "*legal authority*" to proceed with removal "when the subject of the removal order also has a right to seek relief made available by the DHS" not barred by § 1252(g)).

Section 1252(a)(2)(A), by contrast, "makes abundantly clear that" courts have no jurisdiction to review *any* challenge to the implementation of an expedited removal order, except as provided in § 1252(e).  Castro, 835 F.3d at 426-27.  In this sense, § 1252(a)(2)(A) is broader than § 1252(g), so the case law finding § 1252(g) inapplicable to removals outside the Attorney General's prosecutorial discretion is not fully transferable to the § 1252(a)(2)(A) context.

In sum, petitioners' claim seeks to prevent their orders of removal from being implemented. Section 1252(a)(2)(A) squarely applies to such a claim.

    *2. Section 1252(e)*

The Court's conclusion that § 1252(a)(2)(A) applies to petitioners' claim does not end the jurisdictional inquiry. The Court may still have jurisdiction if § 1252(e) specifically authorizes the claim. See Make the Rd. N.Y. v. Wolf, 962 F.3d at 626 (noting that romanettes (i), (ii), and (iv) of § 1252(a)(2)(A) "expressly reserve jurisdiction 'as provided in subsection (e)'"). However, the Court concludes that petitioners' claim likely falls outside § 1252(e) and is therefore barred.

Section 1252(e) provides in relevant part:

> (2) Habeas corpus proceedings. Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—
>
> > (A) whether the petitioner is an alien,
> > (B) whether the petitioner was ordered removed under such section, and
> > (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.
>
> > […]
>
> (5) Scope of inquiry. In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

8 U.S.C. § 1252(e).[6]

Petitioners argue that § 1252(e)(2)(B) supplies jurisdiction, citing this Court's decision in

Dugdale v. CBP, 88 F. Supp. 3d 1 (D.D.C. 2015).  In Dugdale, the petitioner claimed that his

expedited removal order was invalid because it was not signed by a CBP supervisor as required

by the applicable regulations.  Id. at 6.  The Court held that it had jurisdiction to consider this

claim under § 1252(e)(2)(B) because "a determination of whether a removal order 'in fact was

issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural

defect."  Id.  According to petitioners, this case is analogous:

> Here the Transit Ban is void *ab initio*, thus the credible fear determinations and
> subsequent review by an Immigration Judge required for a valid final order of
> removal, predicated on the heightened standard of the Transit Ban, are similarly
> void *ab initio*.  Because, in effect, the Transit Ban Petitioners have no negative
> credible fear determinations, much less review by an Immigration Judge, their
> orders of removal are not final or executable, and do not justify removal.

Pet'rs' Suppl. Mem. 3.

The Court disagrees.  CAIR may well provide a basis to argue that petitioners' removal

orders were unlawfully issued.  But § 1252(e)(2)(B), as interpreted in Dugdale, demands more:

petitioners must raise a claim that their removal orders were, as a matter of law, *not* issued.  See

---

[6] Another subparagraph of § 1252(e) authorizes suits challenging regulations and written
policies regarding the expedited-removal statute, but requires such suits to be brought within 60
days of when the challenged regulation or policy is first implemented.  8 U.S.C. § 1252(e)(3).
All parties agree that § 1252(e)(3) provides no basis for jurisdiction in this case.

If anything, the existence of § 1252(e)(3) further bolsters the Court's conclusion that the
INA likely bars petitioners' claim.  In adopting § 1252(e)(3), Congress created an opportunity for
noncitizens to challenge their expedited removal orders based on the alleged illegality of an
agency rule—but only within the 60-day limitations period.  The plaintiffs in M.M.V.—
including some of the petitioners here—expressly chose not to challenge the Transit Ban directly
under § 1252(e)(3).  By entertaining petitioners' claim that their removal orders cannot be
carried out because they were procured under the Transit Ban, the Court would effectively
license an end run around § 1252(e)(3)'s 60-day deadline for claims along these lines.

Castro, 835 F.3d at 433 (distinguishing Dugdale because, unlike the purported procedural defect there, alleged inadequacies in the credible-fear process preceding an expedited removal order are not even "*arguably* related to the question whether a removal order 'in fact was issued'"). Petitioners cannot shoehorn their claim into this narrow opening.  As discussed above, there is no sound reason to conclude that when Judge Kelly vacated the Transit Ban, he also intended to vacate petitioners' final orders of removal, or that his judgment automatically had that effect.

Unlike Dugdale, this case is about whether the government may lawfully implement the removal orders it has issued, not whether it issued those orders at all.  Section 1252(e)(2)(B) provides no jurisdiction over such a claim.  The INA thus prohibits this Court from ruling on petitioners' claim.

### 3.  Suspension Clause

Finally, petitioners argue that if the INA does purport to strip the Court of jurisdiction over their claim, it violates the Suspension Clause of the Constitution.  This argument must fail because it conflicts with controlling precedent.

The Suspension Clause prohibits the political branches from "suspend[ing]" the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § IX, cl. 2.  The Supreme Court recently considered the application of the Clause in circumstances similar to those here.  In DHS v. Thuraissigiam, an asylum seeker who had received an expedited removal order filed a habeas petition, challenging the process by which the government reached his negative credible-fear determination and seeking "a new opportunity to apply for asylum and other forms of applicable relief."  140 S. Ct. 1959, 1967-68 (2020) (citation omitted).  The Court held that Congress could bar this claim because the Suspension Clause does not apply to a habeas petition seeking "to obtain additional

administrative review of [an] asylum claim and ultimately to obtain authorization to stay in this country."  Id. at 1963.  The Court explained that "the historic core of habeas" consisted of claims challenging a person's physical confinement.  Id. at 1970-75.  While reserving the question of whether the Suspension Clause provides *any* protection beyond "the scope of the writ as it existed in 1789," id. at 1969 n.12, the Court made clear that the Clause may not be used to "extend the writ of habeas corpus far beyond its scope when the Constitution was drafted and ratified."  Id. at 1963 (citation omitted).

Thuraissigiam forecloses petitioners' Suspension Clause argument.  As petitioners admit, they are bringing "'non-core' [habeas] claims because they do not seek release from custody, but rather challenge Respondents' legal authority to deport them prior to the exhaustion of their legal right to seek asylum."  TRO II Mot. 15.  That describes precisely the type of habeas claim that Thuraissigiam found to be "far beyond" the writ's historic scope and therefore outside the Suspension Clause's protection.  140 S. Ct. at 1963 (rejecting application of Suspension Clause to petition seeking "to obtain additional administrative review of [an] asylum claim and ultimately to obtain authorization to stay in this country").  While Petitioners say they do not seek an "*order* directing Respondents to provide them with a new opportunity to apply for asylum," Reply 6 (emphasis added), they expressly seek a declaratory judgment to the same effect.  See Am. Pet'n & Compl. 75 (asking the Court to "[d]eclare Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process").  The declaration petitioners seek is no closer to the habeas heartland than the relief sought in Thuraissigiam.

Petitioners argue that this case differs from Thuraissigiam because here, petitioners contend that the Suspension Clause is not strictly limited to the scope of the writ in 1789—a proposition that the Thuraissigiam Court neither endorsed nor rejected.  Reply 6, 10.  True

enough.  See Thuraissigiam, 140 S. Ct. at 1969 n.12; id. at 1969 (parties agreed there was no
need for the Court to analyze whether Suspension Clause protection exceeds the scope of the
circa-1789 writ).  But even if Thuraissigiam leaves room for *some* constitutionally protected
habeas claims outside the writ's historical core, it squarely rules out *this* claim as a candidate for
Suspension Clause protection.  See id. at 1969 n.12 (stating that "the writ has *never*
encompassed" claims seeking an opportunity for further administrative review of asylum claims
(emphasis added)).  Whatever support petitioners' argument might have in the pre-Thuraissigiam
case law, it must be rejected today.[7]

Accordingly, Congress's choice to deprive the Court of jurisdiction over petitioners'
claim does not implicate the Suspension Clause, and the Court likely lacks jurisdiction to rule on
petitioners' claim.  The Court appreciates the harshness of this result.  Many reasonable people
will find it troubling that the judicial branch should be powerless to stop the Executive from
deporting asylum seekers who received credible-fear determinations under a rule that a federal
district court has found to have been illegally issued.  But Congress's policy of severely
restricting litigation related to removal orders makes no exception for troubling cases.  See Khan
v. Holder, 608 F.3d 325, 329 (7th Cir. 2010) ("To say that this [expedited removal] procedure is
fraught with risk of arbitrary, mistaken, or discriminatory behavior . . . is not, however, to say
that courts are free to disregard jurisdictional limitations."); accord Castro, 835 F.3d at 433.  Nor

---

[7] Petitioners note that Thuraissigiam did not overrule INS v. St. Cyr, 533 U.S. 289
(2001).  Reply 9.  But they fail to identify any specific legal principle from St. Cyr that survives
and overcomes the effect of Thuraissigiam on this case.  Petitioners also rely on Sean B. v.
McAleenan, 412 F. Supp. 3d 472 (D.N.J. 2019).  To the extent that case suggests that the
Suspension Clause empowers courts to halt a deportation so that a noncitizen can take advantage
of an administrative review process where 8 U.S.C. § 1252 otherwise bars judicial intervention,
see Sean B., 412 F. Supp. 3d at 491, it has lost its persuasive value in the wake of Thuraissigiam.

is the Court free to interpret the Suspension Clause to supply jurisdiction wherever fairness may call for it.

Because the Court concludes that it lacks jurisdiction, Petitioners cannot show a likelihood of success on the merits.  While the D.C. Circuit has suggested that the failure to establish likelihood of success on the merits categorically forecloses preliminary relief, see Sherley, 644 F.3d at 393, the Court will nonetheless proceed to analyze the remaining TRO factors, beginning with irreparable harm.

B.  Irreparable Harm

To justify a TRO, petitioners must show that it is "likely," not merely possible, that they will suffer irreparable harm in the absence of this relief.  Winter, 555 U.S. at 20.  Petitioners have made a sufficient showing to satisfy this requirement.

Deportation pursuant to a removal order is "not categorically irreparable," because some deported noncitizens may still have a realistic opportunity to contest their removal *post hoc* and return to the United States if successful.  Nken v. Holder, 556 U.S. 418, 435 (2009).  Here, however, the harm petitioners seek to avoid is not merely that they will be removed from the country; they fear that after removal, they will find themselves unable to return, even if they ultimately succeed in showing that their deportation was wrongful.  See Reply 20.

This fear is well-founded.  Once deported, petitioners will not be able to participate from abroad in whatever further asylum process they might currently be owed.  See 8 U.S.C. § 1158(a)(1) (asylum applicants must be "physically present" in the U.S.); 8 U.S.C. § 1225(b) (providing procedures for asylum seekers arriving in the U.S.).  In theory, petitioners could continue litigating this case after removal, and if they won, the Court could order the government to transport them back to the U.S. for new credible-fear interviews.  Cf. Nken, 556 U.S. at 435.

But, assuming such a remedy would be logistically feasible, petitioners are unlikely to obtain it. That is so because, as discussed at length above, the Court lacks jurisdiction to grant petitioners *any* relief on their Transit Ban claim, even if it agrees with their argument on the merits.  In other words, petitioners might have an abstract legal right to be present in the U.S. for new credible-fear interviews, but the court cannot vindicate that right by ordering the government to transport petitioners back to the U.S. after their removals.[8]

Therefore, if petitioners want to return to U.S. soil, they will almost certainly need to do so without the government's help.  This will not be easy.  As petitioners allege in their verified amended habeas petition and complaint, and the government has not contested, they arrived in the U.S. only after surviving "dangerous journeys" with their children.  Am. Pet'n & Compl. ¶ 140.  That petitioners were able to make these journeys once is no guarantee that they will be able to do so again.  Moreover, as Judge Kelly observed in <u>CAIR</u>, "recent pandemic-related administrative action appears to have effectively closed the southern border indefinitely to aliens seeking asylum." 2020 WL 3542481, at *22 (citing, *inter alia*, Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31,503 (May 26, 2020)); <u>see also</u> Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico, 85 Fed. Reg.

---

[8] By contrast, the petition for review of the removal order in <u>Nken</u> faced no insurmountable jurisdictional hurdle.  In fact, the Fourth Circuit exercised jurisdiction and *granted* the petition on remand from the Supreme Court.  <u>Nken v. Holder</u>, 585 F.3d 818, 823 (4th Cir. 2009).

51,633 (Aug. 21, 2020).  All told, it is almost certain that if petitioners are deported, they will not be able to reenter the U.S. anytime soon.[9]

Petitioners have therefore shown a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S. Effectively permanent removal from the U.S. would constitute irreparable injury.

C.  Balance of the Equities and the Public Interest

Two TRO factors remain to consider: the balance of equities and the public interest.  In a case against the government, these factors merge.  See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).  Here, there are equities and public interests to balance on both sides.

---

[9] The government has suggested that after being deported, petitioners may apply for refugee status from abroad, offering them an opportunity to return to the U.S. if they meet the legal criteria for asylum.  Hearing Tr. 58.  But the refugee program provides nothing close to a guarantee that petitioners will be able to return to the U.S., even assuming they qualify for protection.  To begin, persons seeking refugee status generally must be outside their country of nationality.  See 8 U.S.C. § 1101(a)(42).  In other words, after being deported to their countries of origin, petitioners would likely need to flee to some other country before applying for refugee status.  Next, a prospective refugee who wants to resettle in the U.S. must receive a referral to the U.S. Refugee Admissions Program (USRAP).  Refugees, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees (last updated May 7, 2020).  Most successful referrals to the USRAP come from the office of the United Nations High Commissioner for Refugees (UNHCR).  DEP'T OF HOMELAND SEC., ANNUAL FLOW REPORT, REFUGEES AND ASYLEES: 2017 3 (2019), https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.  But, UNHCR does not allow prospective refugees to choose their country of resettlement; UNHCR itself decides which country, if any, should receive the referral for resettlement.  Information on UNHCR Resettlement, United Nations High Comm'r for Refugees, https://www.unhcr.org/en-us/information-on-unhcr-resettlement.html (last visited Sept. 12, 2020).  And even if a prospective refugee is fortunate enough to be referred for resettlement in the U.S., there is no assurance that the government will grant admission.  Only a finite number of refugees per year may be admitted. 8 U.S.C. § 1157.

On the government's side, "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established." Nken, 556 U.S. at 436 (quoting Reno, 525 U.S. at 490).  That interest is somewhat diminished here because petitioners "are not being removed because they violated the law."  M.M.V. v. Barr ("M.M.V. II"), No. 19-cv-2773 (ABJ), 2020 WL 2119744, at *3 (D.D.C. May 1, 2020); see also M.M.V. I, 2020 WL 1984309, at *1 (noting that asylum seekers such as petitioners are not "illegal immigrants"). Similarly, the government's interest is arguably undercut when it seeks to remove noncitizens whose "asylum petitions have been denied under troubling circumstances."  M.M.V. II, 2020 WL 2119744, at *3.  As the Court has already noted, reasonable observers could find it troubling that petitioners are being removed pursuant to orders procured under the now-vacated Transit Ban.  Nevertheless, a TRO would implicate the government's legitimate interest in effectuating Congress's policy choice to expedite the removals of noncitizens who are denied asylum after being apprehended at the border without valid entry papers.  See 8 U.S.C. § 1225(b).

On petitioners' side, there is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  Nken, 556 U.S. at 436.  Because it likely lacks jurisdiction, the Court expresses no opinion on whether it is wrongful for the government to remove petitioners at this time, much less whether petitioners face a sufficient likelihood of harm in their home countries to warrant asylum.  But it is clear that a TRO blocking petitioners' removals pending further asylum proceedings would decrease the risk of petitioners being erroneously deprived of asylum and thus subjected to danger after removal.  Petitioners and the public have an interest in minimizing that risk.

Based on these considerations, the balance of equities and the public interest tend to support petitioners.  However, the Court cannot say that these TRO factors weigh strongly in either direction.

* * *

The Court has found that petitioners will likely suffer irreparable harm in the absence of a TRO, and that the balance of equities and the public interest weigh slightly in their favor. However, petitioners are unlikely to succeed on the merits, and the balance of equities and the public interest do not "clearly favor[] granting the injunction." Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009) (citation omitted).  The Court therefore must decline to enter a TRO.

### IV.  Conclusion

For the foregoing reasons, the Court will deny Petitioners' second Motion for Temporary Restraining Order (ECF No. 35) and lift the administrative stay of petitioners' removals.  A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:  September 15, 2020